**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MEAGHAN CIOTTI,<br><br>                Plaintiff,<br><br>    -against-<br><br>CITY OF NEW YORK and<br>JAMIE ANGELASTRO,<br><br>                Defendants. | Case No.: 23-cv-10279<br><br>**AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Meaghan Ciotti, by her attorneys, Crumiller P.C. and C.A. Goldberg, PLLC, doing business together as the Survivors Law Project, as and for her complaint against Defendants City of New York ("NYC") and Jamie Angelastro, respectfully alleges as follows, upon information and belief:

### PRELIMINARY STATEMENT

*"No one likes to arrest cops, sweetie."*
*–Detective Sergeant Bill Hussain*

1.      Sadly, the New York Police Department ("NYPD") has long been known by city residents as a breeding ground for entrenched corruption and sexism. NYPD's Internal Affairs Bureau has been sued for cover-ups and retaliation, while its Special Victims Division has been the target of investigations by the NYC Department of Investigation and the U.S. Department of Justice for its poor treatment of sexual assault survivors.

2.      NYPD's propensity to close ranks around offenders, at the expense of survivors, extends even to those who would assault and abuse their own fellow officers. Ciotti, a police officer, is one such example. Angelastro, her union representative, demanded sexual favors upon threats of her losing her job, and ultimately violently raped her while wielding his gun.

3.      Not only did NYPD know, but for years, it openly refused to take action against Angelastro. Instead, each time Ciotti complained, she was demoted in some manner: moved to a

less desirable shift, a less desirable location, and even forced to undergo unnecessary medical testing. Indeed, NYPD weaponized the emotional distress Ciotti suffered as a result of Angelastro's actions and used it to subject her to unnecessary and invasive psychiatric treatment. To this day, Ciotti lives in fear of Angelastro – both at work and at home. He has shown no compunction about raping, stalking, and threatening her. But she is determined to hold him, and NYPD, accountable.

## PARTIES

4.      Plaintiff Ciotti is an individual residing in New York. At all relevant times herein and to the present, she is employed by NYC in NYPD.

5.      Defendant City of New York is the municipal corporation organized and incorporated pursuant to the laws of the State of New York.

6.      Defendant Angelastro is an individual residing in New York. At all relevant times herein and to the present, he is employed by NYC in NYPD.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 1343, as Plaintiff has asserted claims that arise under federal laws of the United States. This Court has supplemental jurisdiction over Plaintiff's state and city law claims pursuant to 28 U.S.C. § 1367, as those claims are so related to federal claims in this action such that they form part of the same case or controversy.

8.      Venue is proper in the Southern District of New York pursuant to 29 U.S.C. § 1391(b)(1), because it is the judicial district in which NYC resides.

9.      Pursuant to New York State General Municipal law Section 50-e a notice of claim was properly served electronically with the NY Comptroller via the eClaim system on July 19, 2023.

10.     On November 22, 2023, Ciotti filed a timely Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC").

11.     On December 27, 2023, the EEOC issued Ciotti a Notice of Right to Sue.

## FACTUAL ALLEGATIONS

**NYPD's History of Cover Ups and Retaliation**

12.     NYPD is one of the oldest and largest municipal police departments in the United States. It oversees over 30,000 uniformed officers in 77 precincts in the five boroughs.

13.     NYPD officers are unionized members of the NYC Police Benevolent Association ("PBA"), the largest municipal police union in the world. Police unions have long been considered "untouchable."[1] Internally, police unions have used their collective-bargaining power to negotiate contracts that include provisions that "make it more difficult to detect and punish officers who abuse their position."[2] Including "keeping an officer's disciplinary record secret, erasing an officer's disciplinary record after a few years, or delaying any questioning of officers for twenty-four or forty-eight hours after an incident."[3] Historically, these unions have wielded their significant political power to suppress reform and shield officers from accountability for their misconduct against civilians and fellow officers alike. New York City police unions have vocally opposed reform efforts, including but not limited to restrictions on officers' disciplinary records.[4]

---

[1] Steven Greenhouse, "How Police Unions Enable and Conceal Abuses of Power," *The New Yorker* (2020). https://www.newyorker.com/news/news-desk/how-police-union-power-helped-increase-abuses.

[2] Christopher Ingraham, "Police unions and police misconduct: What the research says about the connection," *The Washington Post* (2020). https://www.washingtonpost.com/business/2020/06/10/police-unions-violence-research-george-floyd/.

[3] Steven Greenhouse, "How Police Unions Enable and Conceal Abuses of Power," *The New Yorker* (2020). https://www.newyorker.com/news/news-desk/how-police-union-power-helped-increase-abuses.

[4] Noam Scheiber et al, "How Police Unions Became Such Powerful Opponents to Reform Efforts," *The New York Times* (2020). https://www.nytimes.com/2020/06/06/us/police-unions-minneapolis-kroll.html.

14.     NYPD's Internal Affairs Bureau ("IAB") is the unit responsible for detecting, investigating, and correcting police officers who engage in misconduct or corruption. IAB has historically been accused of intentionally mishandling sexual harassment investigations, leaking confidential information, and retaliating against those who make complaints by transferring them, demoting them, and sending them to NYPD's Psychology Unit.[5]

15.     NYPD's Disciplinary System Penalty Guidelines apply to officers subject to its terms who have engaged in, at the very least, "inappropriate behavior" worthy of a "reprimand." The Guidelines imbue the Director of the Psychology Evaluation Section with the discretion to determine whether an officer shall be removed from duty for medical and/or fitness for duty grounds. Similarly, the Director of the Counseling Services Unit ("CSU") is granted discretion to determine what psychiatric treatments officers are required to undergo, and require those officers to "cooperate with all counseling as determined by the Department's Counseling Services Unit" or otherwise face discipline.[6]

16.     This opaque structure, in tandem with the corrupt practices of the IAB, allows for officers who make protected complaints to be subjected to unconstrained retaliation at the whims of their superior officers.

**Ciotti Begins her Career at NYPD**

17.     On January 9, 2012, 28-year-old Ciotti took the oath "to protect and serve" our community, as she was sworn in as an NYPD officer.

---

[5] Graham Rayman, "Dirty Little Secrets in NYPD's Internal Affairs Bureau," *The Village Voice* (2010). https://www.villagevoice.com/dirty-little-secrets-in-nypds-internal-affairs-bureau/.
[6] New York City Police Department, Disciplinary System Penalty Guidelines, (January 15, 2021), https://www.nyc.gov/assets/nypd/downloads/pdf/public_information/disciplinary-system-penalty-guidelines-effective-01-15-2021-compete-.pdf.

18.     Like most "rookies," Ciotti began her employment as a Day Patrol Officer, where she was assigned to a specific area to maintain order by enforcing laws, directing traffic, investigating accidents, and responding to calls for help.

19.     Her employment continued without incident until August 2015, when she gave birth to her daughter. She began to suffer from post-partum depression, and was prescribed Prozac and Seroquel. After maternity leave, she returned to work without incident.

**Angelastro Takes Advantage of Ciotti's Vulnerability, Assaults Her**

20.     In January 2016, Ciotti's then-boyfriend – another police officer – called Emergency Medical Services to request medical attention for Ciotti, when she appeared to be suffering an anxiety attack. Both were off-duty and they had been drinking alcohol recreationally.

21.     The NYPD treated the request for help with anxiety as an "off-duty incident" related to alcohol usage. As protocol, Ciotti had to report to her Union Representative, who was tasked with guiding her through any disciplinary procedures she might face. She was also placed on a temporary "medical restriction" wherein her gun was temporarily taken, she was reassigned from patrol duties to administrative duties, and was ordered to undergo treatment with NYPD's Psychology Unit, the CSU, and outpatient medical treatment at a mental health facility on Long Island.

22.     In April 2016, Ciotti's CSU caseworker, Karl Shaffer, told her that she might be sent to inpatient rehabilitation. This appeared to be the effective policy at the time for any alcohol-related incidents. Ciotti explained that this was impossible: she was the single mother of a newborn and was already suffering from postpartum depression and anxiety. Shaffer responded that he "[did]n't give a shit," and said, "my wife had three kids, and she was fine." Ciotti began

crying; Shaffer told her she could go "plead [her] case" with the commanding officer of the Medical Division, Inspector John Benoit.

23.    Ciotti set up the meeting with Benoit. She was terrified at the prospect of being separated from her eight-month-old. She was joined at the meeting by her Union Representative Jamie Angelastro, and PBA trustee Pat Hendry, ostensibly there as her advocates. Ciotti explained that she did not suffer from alcohol addiction and she did not want to be separated from her baby. Benoit joked that she was "too pretty to be an alcoholic," but she had to go anyway. Neither Angelastro nor Hendry said anything to advocate for Ciotti; instead, they laughed along with Benoit.

24.    Ciotti felt relieved when, on April 21, 2016, Angelastro asked her to meet him at a bar to "discuss her situation." As the Union Representative of their precinct, he knew everyone, was well-liked, and had some twelve years on the force.

25.    After work one day, the two met at a nearby bar. Ciotti confided in Angelastro about difficulties she was having with her postpartum depression and her relationship with her daughter's father.

26.    Angelastro reassured Ciotti that he "knew people" who could help her avoid the inpatient facility. He then proceeded to explain that he knew how to get out of trouble. He even bragged that he had been discharged by the Air Force for rape – "and still got this job." He added that he also had domestically abused an ex-girlfriend and that he had "made her complaint go away."

27.    Angelastro then leaned closer and whispered, "I would love to help you out so I could throw you against a wall."

28.    Ciotti left this meeting even more fearful and uneasy than she had been before. Nothing scared her more than the inpatient facility and the separation from her newborn that would entail.

While she was disgusted by Angelastro's behavior, she felt that she needed to develop a friendly relationship with him so as to avoid further discipline. She was also frustrated, because the coerced treatment she received related to alcohol abuse, rather than to postpartum depression she actually suffered from.

29.     Later that week, on April 26, 2016, Ciotti decided that the only way to avoid being sent to the inpatient facility was to resign from the NYPD. She headed to her precinct in tears to submit her notice. On her way to the station, she contacted Angelastro for advice. He told her not to resign, that he could help, and that she should instead go to his home to "talk things through." She agreed.

30.     Ciotti arrived in tears and began telling him how scared and hopeless she felt. Suddenly, Angelastro lunged at her, grabbed her with both hands, forced her against the kitchen table, pressed his erect penis against her, and tried to forcibly kiss her. Stunned, Ciotti fought him off. He asked her to go upstairs to the guest bedroom; she refused and fled.

31.     After the assault, Ciotti avoided Angelastro the best she could. However, he called and texted her incessantly, threatening her that her job was in "jeopardy" and that he could "take care of things." He made it clear that his vague assurances were conditional, saying, "I'll help you out if you help me out."

32.     When Ciotti did not "help [Angelastro] out," he did not "help [her] out." She was informed in late April that she had to attend inpatient rehabilitation for an entire month, which she did from May 1 to 31, 2016. When she returned, she remained on administrative duty.

33.     In late June 2016, following her return from inpatient rehabilitation, Angelastro told Ciotti he had bought a "burner phone" to communicate with her without his wife knowing.

34.    Although Ciotti continued to ignore Angelastro's attempts to meet her outside of work, he became increasingly aggressive and continued to call her, text her, and show up at her location, uninvited.

**Angelastro Rapes Ciotti and Exploits Her Job Insecurity**

35.    One night in August 2016, while Ciotti was off duty, she met up socially with another officer, Janet Arneo, at a local restaurant. Her doctors had recently increased her anti-depressant dosage, and as a result, she unexpectedly became very sensitive to alcohol, and had a response to the few drinks she had at the restaurant. She soon felt extremely disoriented and impaired, and struggled to speak or move.

36.    Somehow, Angelastro appeared at the restaurant and joined the two officers. Ciotti remembers Angelastro separating her from Arneo and bringing her to an isolated section of the restaurant. Her next memory is of herself slumped over in the passenger's seat of her car, with Angelastro at the wheel.

37.    Her next recollection is of seeing Angelastro, in the reflection of a mirror, holding her down on a bed and raping her.

38.    The next morning, Ciotti awoke in a motel room, alone. She looked around, confused, not knowing where she was. She left and called Arneo and told her about the memory she had of Angelastro holding her down on the bed. Arneo just laughed and said, "I've known Jamie since high school and that's how he is." This reaction shocked and embarrassed Ciotti, who decided not to report the assault.

39.    After the rape, Ciotti experienced bouts of major depressive and anxious episodes. She felt helpless, scared, and alone.

40.     Angelastro continued to assure Ciotti that he would help her. He habitually listed names of his friends in the NYPD who could "make [her] problems go away." Although she was disgusted by Angelastro, she was terrified of the consequences if she refused his advances.

41.     She tried to convince herself that what happened wasn't so bad. She agreed to meet up with Angelastro on several occasions after, either at a bar or restaurant, or at her house where he brought alcohol. After he pressured her to drink heavily, he would engage in sexual activity with her while she was impaired. She believed she had no alternative, especially in light of his continuing threats and promises.

42.     In October 2016, Ciotti was walking home when she received a call from Angelastro. Angelastro asked Ciotti where she was. She told him she was walking home down Delaware Street in Long Beach, not far from her home. A few minutes later, Angelastro pulled up in his car and demanded Ciotti get in.

43.     Ciotti refused. Angelastro got out of the car and approached Ciotti. He grabbed her by the waistband of her pants with one hand and tried to shove his other hand down the front of her pants.

44.     Ciotti blocked his hand and pushed Angelastro away from her. She shouted, "get the fuck off me," ran home, and locked the door behind her.

45.     Ciotti was terrified. She desperately wanted to shield her daughter from the consequences of losing her job. She felt worthless and afraid.

46.     These conflicting emotions made something click. Ciotti realized that Angelastro was abusing her and exploiting her vulnerability and job insecurity. She cut off contact with him.

**Angelastro Rapes Ciotti, Wielding Gun**

47.    Ciotti tried her best to get her life back to something like normal.

48.    In January 2017, she was finally taken off administrative duty and put back on patrol.

49.    However, after months, Angelastro was calling her on the phone several times a week. She did not answer and tried to keep doing her job.

50.    In August 2017, one of Angelastro's coworkers, Brian Martini, told Ciotti that Angelastro had formed the misimpression that Martini and Ciotti were in a relationship, and that Angelastro had threatened to punch Martini in the face and knock his teeth out.

51.    On August 31, 2017, Ciotti attended a police convention upstate. She rented a house with another officer, Sergeant Deanna Dandrea and her husband, Phil Dandrea.

52.    Unbeknownst to Ciotti, the Dandreas had invited Angelastro to stay in the house with them.

53.    Early the first afternoon, Angelastro arrived at the house from the convention, drunk, and stumbled out onto the porch where Ciotti was sitting alone. Proclaiming that he was "wasted," he pulled his gun from his waistband and pointed it directly at Ciotti with an eerie grin. He then raised it over his head and fired two shots into the air.

54.    Ciotti fled the porch to her bedroom. But Angelastro followed her into the bedroom and closed the door behind him. He announced that he had taken Viagra.

55.    Angelastro tossed his loaded gun on the bed, grabbed Ciotti, and forced her onto the mattress besides the gun. Ciotti, frozen with fear, remained silent as Angelastro overpowered her, undressed her, and raped her.

56.    When he was done, Ciotti immediately went to the bathroom where she threw up.

57.     After taking a shower, Ciotti told Angelastro that she had had enough. She told him that she was going to report him "if this doesn't stop."

58.     Angelastro became irate. He charged at Ciotti and threw her to the ground. He screamed at her, "I'm going to fucking kill you, you're ruining my life."

59.     He then yanked her head back by her hair and began to strangle her. With his right hand on her throat, he used his free hand to pull off her towel, exposing her naked body. She struggled with him on the ground, trying to gasp for air as she felt herself losing consciousness. She managed to throw up her leg and kick him as hard as she could, enough to knock him off her. She screamed.

60.     Deanna heard the sounds and ran out of her bedroom. She ripped Angelastro off Ciotti and ordered him to leave, which he did.

61.     The next morning, at 6 a.m., Ciotti drove back to New York City in silence with the Dandreas. Ciotti, embarrassed, laid down in the backseat and closed her eyes. She did not want to discuss what had happened.

62.     That day, Ciotti emailed Angelastro about the escalating violence. She wrote:

> You put your hands on me like I'm a rag doll and sit there like a bitch and make excuses. You will never ever speak to me, or look at me at work. I should have socked the shit out of you for ripping my hair out. A true piece of shit you are.

On September 5, 2017, while at work, Angelastro tried to accost Ciotti. Before he said a word, Ciotti panicked and yelled "get away from me!" This caught the attention of a concerned officer who approached the two to see what was happening. When he noticed the officer, Angelastro fled.

**Ciotti Summons the Courage to Report the Rapes**

63.     Around mid-September 2017, Ciotti spoke to her immediate supervisor for patrol, Lieutenant David Cordano. She told him that she needed a transfer to a different precinct "because of an incident that happened."

64.     Cordano casually replied that he already knew what she was talking about. He said he had heard about it from Arneo and Deanna Dandrea.

65.     Ciotti was shocked that it appeared to be common knowledge that Angelastro raped her, and yet nobody had done anything to help her. Cordano, as her Lieutenant, was responsible for escalating any such complaints, but he did not. He did not even respond to her transfer request.

66.     Angelastro, presumably realized there would be no consequences to his actions, began to stalk Ciotti. He not only resumed calling and texting her repeatedly every day, but went so far as to show up to her home on multiple occasions.

67.     Ciotti was terrified of Angelastro's erratic behavior, and that he would seek to harm her – or, worse, her daughter.

68.     In December 2017, Ciotti awoke to a dozen missed calls and exceedingly frantic texts from Angelastro. Confused, she called him back. He told her that the night before, he had confronted a group of men outside her house. He claimed the men said they were there to attack Ciotti, but he had chased them off with his gun. Ciotti did not know what to make of this bizarre fabrication and simply hung up the phone.

69.     On January 13, 2018, around 11 p.m., Ciotti was alone at home, on the phone her friend, another police officer, Danielle Campo. She heard a knock on her door. Still on the phone, she opened the door just a crack. It was Angelastro. He demanded come inside. Ciotti refused. She tried to close the door, but Angelastro pushed on the door with enough force that Ciotti was

knocked backwards. He forced his way into her home as she yelled in terror. But when he

realized she was on the phone with someone, he fled.

70.     Ciotti immediately locked the door and ran to each window to make certain that they

were secure and that the blinds were shut. She retreated into her bedroom, huddled in a corner in

the dark, so that her shadow could not be seen through the window from the street.

71.     Shortly after this incident, Ciotti decided that she had had enough. She mustered up the

courage to tell her immediate supervisor in the Domestic Violence Unit, Sergeant Tamra Diaz, of

Angelastro's assault of her and subsequent behavior.  When Ciotti explained everything that had

happened between her and Angelastro, including how Angelastro assaulted her, Diaz was

shocked. She expressed how sorry she felt for Ciotti and repeatedly stated, "he fucking preyed on

you, Meaghan."

72.     Diaz vowed to handle the situation properly and told Ciotti that she would escalate her

complaint.

73.     On January 25, 2018, Ciotti received a call from precinct Integrity Control Officer

Lieutenant Kathleen Van Buren. Van Buren told Ciotti that she was aware of the situation

between Ciotti and Angelastro.

74.     Racked with anxiety, Ciotti was immediately reduced to tears. Through her tears, Ciotti

detailed Angelastro's harassment, assault, and stalking. Van Buren stated she was "shocked" and

"had no idea how serious" the situation had become. She promised that she would take care of

the situation and notify the precinct's Captain, Janice Holmes.

75.     The next morning, NYPD's IAB called Ciotti and requested she sit for a formal interview

to report Angelastro's abuse, to which she agreed. Ciotti sat for this interview the same day at the

Queens South Borough Station during which she reported everything that had happened with Angelastro since she had met him as her Union Representative.

76.    Shortly thereafter, Angelastro was placed on administrative duty.

**NYPD Arbitrarily Demotes Ciotti Within Two Weeks of Reporting the Assaults**

77.    On February 6, 2018, Angelastro underwent a psychological evaluation with Dr. Catherine Lamstein in the CSU.

78.    During his session with Lamstein, Angelastro denied all Ciotti's complaints of abuse, rape, and harassment, and Angelastro told Lamstein that Ciotti was mentally unstable.

79.    He relayed what Ciotti had told him in confidence about her post-partum depression, anxiety, and medication, without sharing the circumstances in which he had gained that information.

80.    The next day, February 7, 2018, Union Representative Richie Collins called Ciotti and requested a meeting to discuss Angelastro's report that Ciotti suffered from acute mental illness. He told her that, in light of the report, Ciotti would go back on restricted duty, effective immediately, with her gun and badge removed.

81.    While Angelastro's accusations against Ciotti were considered credible and had near immediate effect; the NYPD gave no meaningful effect to Ciotti's complaints of multiple rapes and ongoing abuse.

82.    Also on February 7, 2018, Lamstein called Ciotti to gather information about Ciotti's accusations against Angelastro. Lamstein openly blamed the victim: Ciotti was at fault for Angelastro's behavior and for her own situation. Ciotti attempted to explain that Angelastro had harassed her, raped her, assaulted her, and subsequently stalked her when she tried to cut off

communication with him. Lamstein responded, "I don't understand why you don't just block his number."

83.     The same day, Angelastro emailed Ciotti asking to meet with her in person – alone – to explain "this chaos." Ciotti refused, fearing he would physically attack her again. Later that day, he called and told her that he knew her new schedule, and that he had the same days off (Wednesdays and Thursdays). Terrified, she asked him how he had found out her schedule. He simply replied, "I have my ways."

**Angelastro Violates Ciotti's Restraining Order Against Him**

84.     The next day, February 8, 2018, Ciotti went to Family Court to obtain an Order of Protection (the "2018 Order") against Angelastro. The 2018 Order was valid through November 18, 2018, and required him to refrain from "assault, stalking, harassment," and from "communication or any other contact by mail, telephone, email, voicemail, or other electronic or any other means."

85.     Angelastro promptly proceeded to violate the 2018 Order by continuously calling Ciotti, texting her, and sending her emails. One time, she even saw him driving past her house and then following her car. Ciotti reported all of this to the Long Beach and Nassau Police Departments. They did nothing.

**Ciotti's Supervisors Retaliate Against Her Shortly Following Her Complaint**

86.     Later that month, in February 2018, Captain Holmes assigned Ciotti to Cell Attendant duty.

87.     Cell Attendant duty responsibilities include searching and monitoring detainees at the precinct detention cells, reporting any unusual activity to the desk officer, attending to the personal needs of the detainees, maintaining safety of the detention cells, keeping accurate

records of detainees in the detention cells, and performing other clerical or administrative duties as directed.

88.    Holmes ordered Ciotti to sit outside the precinct's holding pen, even when it was empty, which was not usually required of a Cell Attendant. Holmes told Ciotti she could not leave the holding pen cell room for any reason, regardless if any detainees were being held in the holding pen, thereby forcing Ciotti to sit alone for hours. Ciotti remained on Cell Attendant duty for four months.

89.    The same week Holmes transferred Ciotti, Ciotti's partner, Officer Joe Ferrari, was also transferred from patrol duty.

90.    Upon learning of his transfer, Ferrari went to Holmes, and asked, point blank, if he was being transferred because of Ciotti's complaints against Angelastro. Holmes simply responded, "yes."

91.    In early March 2018, Ciotti received a phone call from Nassau County Detective Sergeant Bill Hussain, who told her to stop reporting Angelastro for violating the 2018 Order. Ciotti recounted her entire experience with Angelastro, going back to 2016. She pleaded with Hussain to do something about Angelastro's violations of the 2018 Order.

92.    Hussain responded condescendingly, "[n]o one likes to arrest cops, sweetie." Ciotti hung up the phone, hopeless.

93.    In mid-March 2018, Sergeant Dandrea, who was in charge of scheduling at that time, changed Ciotti's shift from the day shift to the night shift. When Ciotti found out that she was assigned to the night shift, she called Sergeant Dandrea and explained that she could not work

the night shift because she did not have anyone to watch her daughter at that time.[7] Dandrea ignored Ciotti's pleas, and she was scheduled for the night shift anyways.

94.      Ciotti made multiple requests to Sergeant Dandrea to transfer her back to the day shift. Eventually, Sergeant Dandrea threatened to transfer Ciotti to another location if she continued to make requests to be scheduled for the day shift.

**Another Female Police Officer Complains to IAB and Both She and Ciotti Are Retaliated Against**

95.      In June 2016, after returning from inpatient rehabilitation, Ciotti began to spend time with another female officer at the 100th precinct, Danielle Campo.

96.      Ciotti and Campo became close friends and Ciotti disclosed to Campo that she was being harassed by Angelastro.

97.      In turn, Campo shared that she was also being harassed by another officer, Paul Marecki, at the 100th precinct.

98.      Campo disclosed that since 2014, Marecki had continued to make inappropriate comments to her, both in person and through harassing text messages.

99.      When Campo tried to confront Marecki about his behavior, he only seemed to get more aggressive with her.

100.     In January 2016, Campo complained multiple times to her supervisor about Marecki's unrelenting harassing conduct, who simply laughed it off.

101.     Based on her own experiences, Campo had warned Ciotti in 2016 not to make complaints about Angelastro's sexual harassment.

---

[7] Her daughter's father also worked the night shift during this period.

102.    However, the harassment Campo experienced only escalated. In 2017, another officer, Jon Mercado, began sexually harassing Campo. In January 2018, Mercado sexually assaulted Campo when he tried to grab her breasts and force her to perform oral sex on him. [8]

103.    After hearing about Campo's experience reporting harassment to her supervisor, Ciotti was further compelled to remain silent about Angelastro's ongoing harassment.

104.    Finally, on April 1, 2018, Danielle Campo broke her silence and complained to IAB about relentless sexual harassment by Marecki.

105.    Shortly after Campo complained to IAB, she started receiving offhand negative comments from Holmes. Holmes suddenly began accusing Campo of "not doing [her] job" and told Campo that she was "on thin ice" and "no one wanted to work with [her]."

106.    In late April 2018, in a meeting with Holmes, Ciotti brought up Campo's harassment complaint. In response, Holmes muttered, "[i]f you don't stay out of her shit, you'll be out."

107.    Campo was transferred out of her unit shortly after making her complaint. Campo was told that she was being transferred because no other officers wanted to work with her. However, Campo's shifts were changed so that she worked only on the most undesirable assignments, such as transporting hospitalized prisoners.

108.    On May 10, 2018, Campo formally complained to the Equal Employment Opportunity Division ("EEOD"), detailing the sexual harassment and sexual assault.

109.    In retaliation for her protected activities, Campo was transferred to undesirable platoon shifts.

---

[8] *See Campo v. City of New York*, 19 Civ. 04364 (NGG) (SJB) (E.D.N.Y. July 30, 2019) (Dkt. No. 1).

110.    Thereafter, Campo was advised that the EEOD investigation had been referred in its entirety to IAB. However, IAB failed to take any action to stop the continued sexual harassment by Marecki and Mercado or ongoing retaliation Campo was experiencing.

111.    Ultimately, Campo filed suit against NYC based on her experience at the NYPD in 2019.[9]

**Ciotti Transfers out of the 100th Precinct**

112.    In early May 2018, on the heels of Campo's complaint, without any warning, Holmes transferred Ciotti to a desk position in the Narcotics Unit in Brooklyn. Upon information and belief, the Narcotics Unit in Brooklyn is known among NYPD officers as a location where disciplined officers are sent as a form of discipline.

113.    While working in the Narcotics Unit, Ciotti realized that she could never go back to the 100th precinct. She was relieved to be away from Angelastro and the thought of being anywhere near him again made her sick to her stomach.

114.    Without any meaningful action by the NYPD to protect her, Ciotti concluded she had to request a transfer away from Angelastro. On July 16, 2018, Ciotti submitted a formal location transfer request from the 100th precinct to the 101st precinct.

115.    In August 2018, Officer Campo called Ciotti and informed her that Angelastro had showed up to the 100th precinct and gloated he was reinstated and that his gun and badge were returned.

116.    Concerned for her safety, Ciotti called IAB to complain of Angelastro's reinstatement. Ciotti explained that Angelastro had violated the 2018 Order on multiple occasions, and she had

---

[9] *See Campo v. City of New York*, 19 Civ. 04364 (NGG) (SJB) (E.D.N.Y. July 30, 2019).

serious concerns for her safety. The IAB officer told her that they recorded her statement, but no further action was taken.

117.    For months, Ciotti went to work racked with anxiety that she would be faced with her abuser at any moment.

118.    One day, in October 2018, she felt a sharp pain in her chest that was so intense it affected her breathing and motor skills.

119.    After speaking with Officer Ron Thomas in the Employee Assistance Unit about her debilitating fear of being in close proximity to Angelastro again, she was able to arrange for a transfer to the 101st precinct.

**NYPD's Retaliation and Angelastro's Harassment Escalate**

120.    By November 2018, the 2018 Order had expired. On January 28, 2019, while Ciotti was taking out the trash, she was startled to see Angelastro's car barreling down the street in front of her house. She quickly ran back inside and locked the door.

121.    The next day, Ciotti filed for a second Order of Protection against Angelastro (the 2019 Order) in Family Court in Nassau County, which was granted and set to expire July 27, 2019. Ciotti called her Union Representative, PBA Representative Matt Beigay, and reported that she had filed another Order of Protection against Angelastro.

122.    That same day, she called PBA Trustee Joe Rao regarding the 2019 Order against Angelastro. Ciotti explained that she was scared that Angelastro was going to retaliate against her for filing another Order of Protection but felt she had no choice because she was scared for her safety. She stated, "I don't know what else to do and I can't go through this again." Rao tried to convince Ciotti to drop the 2019 Order. Ciotti said, "[t]his has gone on long enough and I need

to protect myself and my daughter. I'm not going to drop it. All of you are only looking out for [Angelastro]." Rao became enraged and responded, "[g]o fuck yourself."

123.    On November 12, 2018, upon information and belief, Angelastro asked several officers at the 101st precinct about Ciotti; he called PBA Representative Ed Moore of the 101st precinct and asked about her. Moore reported to Ciotti that Angelastro called him, and, after speaking briefly, Angelastro asked, "[w]hat's up with your girl, [Ciotti]?" Moore replied, "I don't know what you're talking about," and quickly hung up the phone.

124.    Ciotti reported this to 101st precinct's Captain Erik Robinson and requested he remedy the situation. Captain Robinson responded: "I don't want any trouble for you. So, I'm going to have you voucher your gun for the next week or so at night. [10] I know [Angelastro] is crazy and I don't want you getting into anything serious with him." Ciotti wanted to avoid "any trouble" with Angelastro, so she agreed to voucher her gun for the following week.

125.    In mid-November, in the morning, Ciotti drove to a friend's house in Island Park near Angelastro's residence. That evening, departing from her friend's house, Ciotti stepped outside when she noticed a figure standing across the street staring at her. Ciotti recognized the figure to be Angelastro and was terrified. She had no idea how he had located her. Ciotti screamed at Angelastro, "[l]eave me the fuck alone!" She then got into an Uber and went home, panicked that Angelastro was following her.

126.    On November 14, 2018, Ciotti became aware that Angelastro filed an Order of Protection against her. Angelastro's Petition for his Order of Protection against Ciotti falsely claimed that Ciotti showed up at his home and stated that she was going to kill him.

---

[10] To "voucher" a gun means to store it in a locked box at the Police Department.

127.    A few days later, Ciotti was called into a meeting with PBA Representative Moore, PBA Representative Beigay, and Captain Robinson. They told her that she was again being placed on modified duty, and her gun and her badge were suspended due to Angelastro's Order of Protection against her. Additionally, they informed Ciotti that she was being transferred immediately. Captain Robinson explained that this action was ordered by Chief Joe Reznick of Internal Affairs, who personally wanted her removed from the precinct.

128.    The next day, Ciotti reported to the personnel section to find out where she was being transferred. She was informed that she was transferred to Viper 8, where she would be tasked with monitoring surveillance cameras in public housing areas.

129.    Nearly two years later, in September 2020, Ciotti was finally removed from modified duty and returned to the 101st precinct.

130.    In June 2021, Ciotti brought her daughter to her classmate's birthday party in Island Park, New York.

131.    After spending two hours at the party, Ciotti left with her daughter and took her to a playdate.

132.    While she was walking home from dropping off her daughter, she got a call from a Nassau County police officer who accused Ciotti of violating Angelastro's Order of Protection by going to his house.

133.    Shortly thereafter, the host of the party called Ciotti and informed her that five or six police officers had shown up to the birthday party after Ciotti left. They asked where Ciotti was.

134.    Ciotti was mortified, shocked, and upset. She began hyperventilating, crying, and had a panic attack on the sidewalk. She called her daughter's father for support. When she finally calmed down, she walked herself home.

135.    Ciotti later learned that Angelastro reported that Ciotti had violated his Order of Protection against her.

136.    Thereafter, Ciotti went to Nassau County's fourth precinct to file a criminal complaint against Angelastro for making a false report against her. At the precinct, an officer persuaded Ciotti not to file a criminal complaint and told her, "[i]f you do this, it's going to turn into a big deal." This deterred Ciotti from filing a criminal complaint against Angelastro and left the precinct, defeated.

137.    Ciotti spoke with PBA Representative Beigay regarding Angelastro's Order of Protection against her. Ciotti explained that she wanted to go back to court and take out a temporary restraining order against Angelastro. Beigay responded, "[y]ou really shouldn't go back to court. It's not going to end well for you," and successfully dissuaded Ciotti.

138.    In July 2021, at approximately 4:40 p.m., Ciotti was on patrol in Times Square with her partner, Police Officer Gary Williams. While working, she noticed Angelastro approaching with a group of officers. Angelastro walked towards the car, sat on the hood, and glared at Ciotti. Williams told Ciotti he would handle the situation and to stay in the car. He got out and spoke to Angelastro for several minutes. Ciotti and Williams immediately left and returned to the command post.

139.    On December 14, 2021, while at work, Ciotti noticed a white van speeding down the street. The car pulled up beside Ciotti's and rolled down the window. Ciotti recognized the man behind the wheel as Angelastro's roommate, Al Farina. Farina screamed: "do you remember me, bitch?!" Ciotti rolled up her window and ignored Farina while he continued to loudly berate her. She promptly called back-up, and Farina was taken to the police station. Ciotti made a criminal complaint of harassment against Farina and reported this incident to Internal Affairs.

140.    When Ciotti followed up with Captain Robinson, she explained that she wanted to charge Farina with stalking and aggravated harassment and for him to be arrested. Robinson simply told Ciotti to "let it go."

**NYPD's Mental Health Services Are Weaponized Against Ciotti**

141.    In June 2022, Ciotti married Paul LaRocca.

142.    In August 2022, Ciotti consulted with Dr. Kristin Waldron, a neurologist at Long Island Neurology Consultants, to diagnose her increased neck pains and migraines. Dr. Waldron advised Ciotti she suffered cervicogenic migraine disease, likely caused by a neck injury. The only neck injury Ciotti could recall was caused by Angelastro's August 31, 2017 attack when he grabbed her by the hair and wrenched her head backwards. Waldron therefore concluded this was the likely cause of her continued neck pain and related migraines.

143.    On October 3, 2022, Ciotti reported neck pain and cervicogenic migraines to NYPD Medical Services. She submitted Dr. Waldron's physical examination to Medical Services and was placed on restricted duty due to her injury. Thereafter, Ciotti performed administrative tasks at the front desk of the 101st precinct including, but not limited to, answering phones and writing reports. She was set to return to the clinic for re-evaluation on November 7, 2022, following medical approval.

144.    In January 2023, Ciotti drove to pick up her daughter from school. As she approached the school, she saw Angelastro's car parked on the street. Ciotti fled down the street in the opposite direction. She picked up her daughter using an alternate route in order to avoid Angelastro.

145.    Later that month, Ciotti discovered she was pregnant. Ciotti and her husband were thrilled to grow their family.

146.    On February 8, Ciotti visited her physician and learned her pregnancy was high-risk, and her physician advised her to be on bed rest. That day, she informed NYPD's Employee Services and requested to take sick leave.

147.    On February 28, Ciotti took a temporary leave of absence to stay home and rest for her health and the health of her baby.

148.    In March 2023, Ciotti miscarried. Ciotti was devastated, and her mental health suffered tremendously. Shortly thereafter, Ciotti was forced to undergo an extremely difficult dilation and curettage surgery, causing her even more distress.

149.    In mid-April, Ciotti returned from sick leave and resumed her position at the 101st precinct. About a week later, Ciotti suffered more complications from her dilation and curettage surgery and went back on sick leave.

150.    In late April 2023, she reached out to NYPD's Police Organization Providing Peer Assistance ("POPPA") to get support for postnatal depression. The POPPA representative advised Ciotti to visit the CSU. Ciotti explained that she didn't want to speak to an NYPD psychologist because she feared retaliation. Ciotti stated, "[j]ust forget I ever called," and hung up the phone.

151.    Upon information and belief, the POPPA representative breached confidentiality and informed NYPD's Medical Division that Ciotti was suffering from ongoing mental illness which required treatment.

152.    The following day, NYPD's Medical Division called Ciotti and informed her she needed to report to Dr. Lamstein in CSU. Remembering how Lamstein blamed Ciotti for Angelastro's behavior, Ciotti pled with the receptionist to let her see another doctor. The receptionist told

Ciotti that she could not do anything, and, if she wanted to change psychologists, she had to reach out to the Director of the Psychology Department, Dr. Adam Bloom.

153.    Ciotti emailed Bloom to request a different doctor, but he failed to respond.

154.    The next day, Ciotti reluctantly met with Lamstein. Ciotti explained how she had suffered a miscarriage and was struggling with postnatal depression.

155.    Lamstein was not interested in Ciotti's postnatal depression. Instead, Lamstein recounted Ciotti's history with Angelastro as she recalled from 2018. Ciotti was mortified by the mention of Angelastro's name. Through tears, Ciotti tried to explain that her recent struggles had nothing to do with Angelastro, and she was grieving the death of her baby. Nonetheless, Lamstein continued to berate Ciotti with questions about Angelastro and asked her, "[h]ave you been in contact with him recently? Have you spoken to his wife?" Ciotti recounted how she had avoided him for years and had not spoken to him.

156.    At the end of the session, Lamstein concluded that Ciotti had an unstable mental history and placed her on involuntary leave, effective immediately. Ciotti explained that she wanted to seek treatment from a private therapist instead of NYPD Psychology Department, but Lamstein flatly denied her request.

157.    Ciotti again tried to get in contact with Bloom to request a new therapist. She was able to get Bloom on the phone. However, Bloom told Ciotti that she had to go see Dr. Lamstein or she would face suspension.

158.    In June 2023, Ciotti reported to the CSU. While sitting in the office waiting room, Ciotti overheard the Director of the CSU, Dr. Tremaine Sayles, loudly recount her mental health history to other doctors. Ciotti interjected, "I'm sitting right here, and I can hear you. I don't appreciate you screaming my private medical information around the CSU." Sayles demanded

Ciotti go back and sit on the couch. After sitting there for an hour, Ciotti went to the office receptionist and explained that she had to leave to go pick up her daughter from school and intended to return after she did.

159.    Shortly after she left, Ciotti received a call from Detective Vicky Merrill, who introduced herself as Ciotti's caseworker at the CSU. Merrill stated, "Sayles wants you suspended for causing a scene and then leaving." Days later, Ciotti filed an Equal Employment Opportunity ("EEO") Claim against Sayles for sharing her medical information and threat of suspension.

160.    On July 3, Merrill called Ciotti and told her that Sayles ordered Ciotti to attend outpatient therapy sessions three days a week, undergo urine testing, and attend a group therapy session once a week with a psychologist. Ciotti was devastated and could not fathom why she was being forced to undergo any of this, especially the urine testing. Merrill responded, "[t]hat's just what I was told to tell you. I don't know why they referred you to the counseling unit. You really shouldn't be here because your case doesn't involve any off-duty incidents or any instances with drugs or alcohol. Look, just play their game."

161.    Ciotti asked, "[i]s all this retaliation for my complaint against Sayles?" Merrill admitted, "[y]eah, probably." Ciotti was furious; she felt as though she had been retaliated against every time she tried to make a complaint about someone involved in NYPD.

162.    On July 10, Ciotti felt her heart racing and pain in her chest. She was rushed to the emergency room, where the attending physician informed her she was suffering from a panic attack.

163.    On August 10, 2023, Ciotti made another complaint against Dr. Sayles for retaliating against her for the first complaint.

164.    Later that evening, at approximately 10:05 p.m., Ciotti and her family, sound asleep, were woken by two IAB officers pounding on her door. They asked to speak to Ciotti about her EEO complaint against Sayles and they recorded and interviewed her in her living room.

165.    After months of reporting off duty incidents without any acknowledgement from IAB, this sudden and unexpected visit from IAB officers to Ciotti's home so late at night could only be an act of intimidation.

166.    In September 2023, Ciotti attended a therapy session with Lamstein. During the session, without being prompted, Lamstein asked Ciotti, "[d]id Angelastro assault you in your home?" Ciotti was taken back by Lamstein's sudden mention of Angelastro, causing her unwarranted stress and anxiety.

167.    Ciotti's suffering is ongoing. Physically, she suffers frequent migraines as well as almost-constant neck pain due to Angelastro's physical assault of her in 2017. She suffers severe emotional distress and feels humiliated, depressed, and anxious on a daily basis. Ciotti sees a therapist weekly and continues to take medication to treat her depression and anxiety.

168.    Additionally, she is scared for her own physical safety, as well as her daughter's. She is terrified that Angelastro, who owns multiple firearms, will attack her again. Finally, she is devastated that Angelastro's actions have impacted her career. NYPD has failed to take any remedial action and has, instead, retaliated against her.

**POINT OF LAW:**
**Adult Survivors Act**

169.    The Adult Survivors Act, CPLR § 214-j ("ASA"), revives every civil claim alleging intentional or negligent acts or omissions by a person for psychological injury suffered due to a sexual offense as defined in article 130 of the penal law, committed against someone age 18 or older, even if the applicable period of limitation has expired.

170.     Angelastro's actions are qualifying offenses under the ASA, including but not limited to sexual abuse in the first degree (N.Y. Penal Law § 130.65), sexual abuse in the third degree (§ 130.55), sexual misconduct (§ 130.20), and forcible touching (§ 130.52).

171.     Ciotti's claims are not subject to dismissal on the grounds that they are time-barred.

### FIRST CAUSE OF ACTION
### 42 U.S.C. § 1983 Monell Liability: Formal Policy
### *Against NYC*

172.     Ciotti repeats and realleges each and every allegation set forth above.

173.     Before and during Ciotti's employment, NYC, through its policymakers, exhibited willful disregard to Ciotti's Fourteenth Amendment rights to equal protection and/or due process of law, which directly and proximately caused the violations of her rights.

174.     NYPD's disciplinary guidelines imbue CSU with unfettered discretion to require members or service to cooperate with all counseling.[11]

175.     NYPD abused that discretion, in a manner that is discriminatory against women, by subjecting Ciotti to unnecessary medical and psychiatric treatment or facing discipline if she did not comply with CSU's directives.

176.     NYPD's decision to subject Ciotti to unnecessary medical and psychiatric treatment or face discipline if she did not comply with CSU's directives is arbitrary and shocks the conscience.

177.     NYC, through NYPD's CSU, took arbitrary and capricious actions that violated Ciotti's procedural and substantive due process right by subjecting her to a deprivation of her liberty and property.

---

[11] New York City Police Department, Disciplinary System Penalty Guidelines, (January 15, 2021), https://www.nyc.gov/assets/nypd/downloads/pdf/public_information/disciplinary-system-penalty-guidelines-effective-01-15-2021-compete-.pdf .

178.    As a result, Ciotti has suffered emotional and psychological distress, physical injury, mental anguish, loss of enjoyment of life, humiliation, embarrassment, and pain and suffering.

179.    NYC is liable to Ciotti for compensatory damages, attorney's fees, and costs.

**SECOND CAUSE OF ACTION**
**42 U.S.C. § 1983 Monell Liability: *De Facto* Policy or Custom**
***Against NYC***

180.    Ciotti repeats and realleges each and every allegation set forth above.

181.    Before and during Ciotti's employment, NYC, acting through NYPD, developed, implemented, enforced, encouraged, and sanctioned policies, practices and customs exhibiting deliberate indifference to Ciotti's constitutional rights, which caused Ciotti deprivation of equal protection and/or due process of law.

182.    At least three NYPD customs and practices discriminate against female police officers based on their gender:

(a) NYPD has a pervasive and long-standing custom and practice of transferring and/or demoting female police officers in retaliation for making complaints of sexual harassment;

(b) NYPD has a custom and practice in which male officers who sexually harass their female coworkers are not disciplined appropriately and/or in accordance with its own guidelines; and

(c) NYPD has a custom and practice of ignoring female police officers' requests for assistance after self-reporting postpartum and/or postnatal depression and similar mental health issues through POPPA, and instead subjecting them to discipline.

183.    The foregoing *de facto* policies and customs deprive female officers of their rights to equal protection and due process of law.

184.    As a result, Ciotti has suffered emotional and psychological distress, physical injury, mental anguish, loss of enjoyment of life, humiliation, embarrassment, and pain and suffering.

185.    NYC is liable to Ciotti for compensatory damages, attorney's fees, and costs.

**THIRD CAUSE OF ACTION**
**42 U.S.C. § 1983 Monell Liability: Failure to Train**
***Against NYC***

186.    Ciotti repeats and realleges each and every allegation set forth above.

187.    At all relevant times herein, NYC, acting through NYPD, deprived Ciotti her rights to equal protection and/or due process of law through its willful disregard to the obvious need to train its employees in POPPA and CSU regarding postpartum and/or postnatal depression and sexual abuse.

188.    NYPD fails to provide proper training to POPPA counselors and/or CSU officers to address postpartum and/or postnatal depression and sexual abuse.

189.    The lack of proper training around postpartum and/or postnatal depression discriminatorily results in female officers being subjected to treatments and procedures unrelated and irrelevant to the treatment of postpartum and/or postnatal depression and/or sexual abuse.

190.    NYPD's decision to subject Ciotti to mandatory medical treatment or termination if she did not comply with CSU's directives after she voluntarily sought care for postnatal depression after a miscarriage, and based in part upon her prior reports of sexual abuse, is discriminatory on the basis of her gender.

191.    NYC, through the NYPD's CSU, deprives female members of service of their right to equal protection and due process of law.

192.    As a result, Ciotti has suffered emotional and psychological distress, physical injury, mental anguish, loss of enjoyment of life, humiliation, embarrassment, and pain and suffering

193.    NYC is liable to Ciotti for compensatory damages, attorney's fees, and costs.

## FOURTH CAUSE OF ACTION
### Discrimination in Violation of Title VII
*Against NYC*

194.    Ciotti repeats and realleges all facts set forth above.

195.    NYC, acting through NYPD, unlawfully discriminated against Ciotti in the terms and conditions of her employment by subjecting her to disparate treatment on the basis of her gender and/or sex, and pregnancy, in violation of Title VII.

196.    As a result, Ciotti has suffered emotional distress and has incurred compensatory damages, economic damages, attorney's fees, and costs.

197.    NYC, acting through NYPD willfully engaged in discriminatory practices with malice and/or reckless indifference to Ciotti's federally protected rights.

198.    Ciotti is entitled to an award of compensatory damages, economic damages, punitive damages, attorney's fees, and costs.

## FIFTH CAUSE OF ACTION
### Retaliation in Violation of Title VII
*Against NYC*

199.    Ciotti repeats and realleges each allegation set forth above.

200.    NYC, acting through NYPD, unlawfully discriminated against Ciotti in the terms and conditions of her employment by retaliating against her on the basis of her protected activities, including, but not limited to, complaining of and objecting to sexual harassment, in violation of Title VII.

201.    As a result, Ciotti has suffered emotional distress and has incurred compensatory damages, economic damages, attorney's fees, and costs.

202.    NYC, acting through NYPD, willfully engaged in discriminatory practices with malice and/or reckless indifference to Ciotti's federally protected rights.

203.    Ciotti is entitled to an award of compensatory damages, economic damages, punitive damages, attorney's fees, and costs.

**SIXTH CAUSE OF ACTION**
**Discrimination in Violation of the ADA**
***Against NYC***

204.    Ciotti repeats and realleges each allegation set forth above.

205.    At all relevant times, Ciotti was a qualified person with a disability who could perform the essential functions of her job with or without reasonable accommodation.

206.    NYC unlawfully discriminated against Ciotti in the terms and conditions of her employment on the basis of her disability and/or perceived disability of postnatal depression in violation of the ADA.

207.    NYPD was aware that Ciotti suffered from postnatal depression, yet failed to engage her in an interactive dialogue in order to identify effective reasonable accommodations, and instead, subjected her to unnecessary medical treatment for alcohol abuse willful disregard to the obvious need to train its employees.

208.    As a result, Ciotti has suffered emotional distress and has incurred compensatory damages, economic damages, attorney's fees, and costs.

209.    NYC, acting through NYPD, willfully engaged in discriminatory practices with malice and/or reckless indifference to Ciotti's federally protected rights.

210.    Ciotti is entitled to an award of compensatory damages, economic damages, punitive damages, attorney's fees, and costs.

## SEVENTH CAUSE OF ACTION
### Retaliation in Violation of the ADA
#### *Against NYC*

211.    Ciotti repeated and realleges all facts set forth above.

212.    NYC, acting through NYPD, unlawfully retaliated against Ciotti in the terms and conditions of her employment by subjecting her to mandatory medical treatment or risk termination.

213.    NYC unlawfully retaliated against Ciotti for complaining about disability discrimination regarding the medical treatment she was forced to undergo.

214.    As a result, Ciotti has suffered emotional distress and has incurred compensatory damages, economic damages, attorney's fees, and costs.

215.    NYC acted willfully, with malice and/or reckless indifference to Ciotti's rights, entitling her to an award of punitive damages.

216.    Ciotti is entitled to an award of emotional distress damages, compensatory damages, economic damages, punitive damages, attorney's fees, and costs.

## EIGHTH CAUSE OF ACTION
### NYC Gender-Motivated Violence Act
#### *Against both Defendants*

217.    Ciotti repeats and realleges all facts set forth above.

218.    Angelastro's sexual assault and battery of Ciotti constitutes a "crime of violence motivated by gender" against Ciotti as defined by the NYC Victims of Gender-Motivated Violence Protection Law, N.Y.C. Admin. Code § 10-1103 ("GMVA"). His actions were motivated by Ciotti's gender, on the basis of her gender, and due, at least in part, to an animus based on her gender.

219.    NYC enabled Angelastro's crimes by failing and refusing to take appropriate remedial measures, in spite of its knowledge of the abuse, granting him continuing access to her, and retaliating against her for reporting the crimes.

220.    As a result, Ciotti has suffered emotional and psychological distress, physical injury, mental anguish, loss of enjoyment of life, humiliation, embarrassment, and pain and suffering.

221.    Defendants are liable to Ciotti under the GMVA for compensatory damages, punitive damages, attorney's fees, and costs.

**NINTH CAUSE OF ACTION**
**Gender Discrimination in Violation of the NYSHRL**
***Against NYC***

222.    Ciotti repeats and realleges all facts set forth above.

223.    NYC discriminated against Ciotti on the basis of her gender, in violation of the New York State Human Rights Law, N.Y. Exec. Law § 296(1) ("NYSHRL"), by subjecting her to sexual assault and harassment, by subjecting her to a gender-based hostile work environment, and by treating her less well than it treated male employees.

224.    The discrimination was severe.

225.    NYC willfully engaged in discriminatory practices with malice and/or reckless indifference to Ciotti's rights.

226.    NYC's unlawful discrimination against Ciotti caused her to suffer emotional and psychological distress, physical injury, mental anguish, loss of enjoyment of life, humiliation, embarrassment, and pain and suffering.

227.    NYC willfully engaged in unlawfully discriminatory practices with malice and/or reckless indifference to Ciotti's rights.

228.    NYC is liable to Ciotti for compensatory damages, punitive damages, attorney's fees, and costs.

## TENTH CAUSE OF ACTION
## Retaliation in Violation of the NYSHRL
### *Against NYC*

229.    Ciotti repeats and realleges each allegation set forth above.

230.    NYC retaliated against Ciotti for her protected complaints about Angelastro's behavior, as well as Dr. Tremaine Sayles' behavior, in violation of the NYSHRL.

231.    The retaliatory actions to which Ciotti was subjected, including demoting her, suspending her employment in retaliation for reporting Angelastro's conduct, and subjecting her to unnecessary psychiatric treatments could have dissuaded reasonable employees in her position from complaining of discrimination or sexual harassment.

232.    As a result, Ciotti has suffered emotional distress, physical injury, mental anguish, loss of enjoyment of life, humiliation, embarrassment, and pain and suffering.

233.    NYC willfully engaged in unlawfully retaliatory practices with malice and/or reckless indifference to Ciotti's rights.

234.    Ciotti is entitled to an award of compensatory damages, punitive damages, attorney's fees, and costs.

## ELEVENTH CAUSE OF ACTION
## Gender Discrimination in Violation of the NYCHRL
### *Against NYC*

235.    Ciotti repeats and realleges all facts set forth above.

236.    NYC discriminated against Ciotti on the basis of her gender, in violation of the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(1)(a) ("NYCHRL"), by subjecting her to sexual assault and harassment while she was an employee of the NYPD, by subjecting her

to a gender-based hostile work environment, and by treating her less well than it treated male employees.

237.    The discrimination was severe.

238.    NYC's unlawful discrimination against Ciotti caused her to suffer emotional and psychological distress, physical injury, mental anguish, loss of enjoyment of life, humiliation, embarrassment, and pain and suffering.

239.    NYC willfully engaged in discriminatory practices with malice and/or reckless indifference to Ciotti's rights.

240.    NYC's is liable to Ciotti for compensatory damages, punitive damages, attorney's fees, and costs.

**TWELFTH CAUSE OF ACTION**
**Retaliation in Violation of the NYCHRL**
***Against NYC***

241.    Ciotti repeats and realleges each allegation set forth above.

242.    NYC retaliated against Ciotti for her protected complaints about Angelastro's behavior, as well as Dr. Tremaine Sayles' behavior, in violation of the NYCHRL.

243.    The retaliatory actions to which Ciotti was subjected, including demoting her, suspending her employment in retaliation for reporting Angelastro's conduct, and subjecting her to unnecessary psychiatric treatments could have dissuaded reasonable employees in her position from complaining of discrimination or sexual harassment.

244.    As a result, Ciotti has suffered emotional distress, physical injury, mental anguish, loss of enjoyment of life, humiliation, embarrassment, and pain and suffering.

245.    NYC willfully engaged in unlawfully retaliatory practices with malice and/or reckless indifference to Ciotti's rights.

246.    Ciotti is entitled to an award of compensatory damages, punitive damages, attorney's

fees, and costs.

### THIRTEENTH CAUSE OF ACTION
### Negligent Hiring, Supervision, and Retention
### *Against NYC*

247.    Ciotti repeats and realleges each and every allegation set forth above.

248.    NYC negligently hired and/or retained Angelastro when it knew, or should have known,

of his propensity for the misconduct, i.e., his grooming, and sexual assaults of Ciotti, which

resulted in Ciotti's injuries.

249.    Specifically, NYC knew, or should have known, that Angelastro was discharged from the

U.S. Air Force for rape.

250.    NYC negligently retained Angelastro and negligently placed him in a position to cause

foreseeable harm, which Ciotti would not have been subjected to had the City taken reasonable

care in its hiring, supervision, and/or retention of Angelastro.

251.    As a result, Ciotti was injured, causing her to suffer emotional and psychological distress,

physical injury, mental anguish, loss of enjoyment of life, humiliation, embarrassment, pain and

suffering, and economic damages.

252.    No negligence on Ciotti's part contributed to her injuries.

253.    NYC is liable to Ciotti for compensatory damages and costs.

### FOURTEENTH CAUSE OF ACTION
### Sexual Assault & Battery
### *Against Angelastro*

254.    Ciotti repeats and realleges all facts set forth above.

255.    Angelastro intentionally, and without consent, attacked Ciotti to satisfy his own sexual

desires. Angelastro's physical contact with Ciotti was offensive and harmful.

256.    Angelastro battered Ciotti when he unlawfully sexually assaulted her by raping her.

257.    Angelastro acted carelessly, recklessly and/or intentionally, and knew that his action against Ciotti constituted assault, causing her apprehension of harmful or offensive contact.

258.    Angelastro's assault and battery of Ciotti caused her to suffer emotional and psychological distress, physical injury, mental anguish, loss of enjoyment of life, humiliation, embarrassment, pain and suffering, and economic damages.

259.    In addition to being intentional and deliberate, Angelastro's sexual assault and battery has the character of outrage associated with crime.

260.    Ciotti is entitled to an award of compensatory damages, punitive damages, and costs.

## DEMAND FOR RELIEF

WHEREFORE, it is respectfully requested that the Court enter judgment in favor of Ciotti, in an amount to be determined by the trier of fact, as follows:

a) on the First, Second and Third Causes of Action, awarding compensatory damages, attorney's fees, and costs, as against NYC;

b) on the Fourth Cause of Action, awarding compensatory damages, punitive damages, attorney's fees, and costs, as against both Defendants;

c) on the Fifth, Sixth, Seventh and Eighth Causes of Action, awarding compensatory damages, punitive damages, attorney's fees, and costs, as against NYC;

d) on the Ninth Cause of Action, awarding compensatory damages and costs as against NYC;

e) on the Tenth Cause of Action, awarding compensatory damages, punitive damages, and costs, as against Angelastro; and

f) granting such other relief as may be just.

**DEMAND FOR TRIAL BY JURY**

Pursuant to FRCP 38, Ciotti demands a trial by jury.

Dated: Brooklyn, New York
       February 8, 2024

                              Respectfully submitted,

                              Olivia Davis
                              Arastu Chaudhury
                              Crumiller P.C.
                              olivia@crumiller.com
                              arastu@crumiller.com

                              Carrie Goldberg
                              C.A. Goldberg, PLLC
                              carrie@cagoldberglaw.com

                              Together, d/b/a Survivors Law Project
                              16 Court St, Ste 2500
                              Brooklyn, NY 11241
                              (877) 757-9467
                              Attorneys for Ciotti