UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MEAGHAN CIOTTI,

                                Plaintiff,

        – against –

CITY OF NEW YORK *and* JAMIE
ANGELASTRO,

                                Defendants.

**OPINION & ORDER**

23 Civ. 10279 (ER)

Ramos, D.J.:

Meaghan Ciotti brings this employment discrimination action against the City of New York (the "City") and police officer Jamie Angelastro, alleging gender discrimination, disability discrimination, and unlawful retaliation under federal and state statutes, as well as state-based claims of negligence and gender-motivated violence. Doc. 12. Before the Court is the City's partial motion to dismiss[1] the First Amended Complaint ("FAC") for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Doc. 22. For the following reasons, the motion is GRANTED in part and DENIED in part.

## I.      BACKGROUND

### A.  Factual Background

The following facts are drawn from allegations contained in the FAC, Doc. 12, which the Court accepts as true for purposes of the instant motion. *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

Ciotti has been an officer with the New York City Police Department ("NYPD") since 2012. FAC ¶ 17. She was initially assigned to patrol duty on a dayshift. *Id.* ¶ 18.

---

[1] The City moves to dismiss all federal claims against it, as well as the claims of retaliation under the NYSHRL and NYCHRL; it does not move to dismiss the claims of discrimination under the NYSHRL and NYCHRL, nor the state claims of negligence and gender-motivated violence. *See* Doc. 23 at 1–2. A clerk's certificate of default was entered as to Angelastro on July 17, 2024, for his failure to answer or otherwise move with respect to the complaint. Doc. 31.

Officers on patrol duty are responsible for maintaining order in designated zones "by enforcing laws, directing traffic, investigating accidents, and responding to calls for help." *Id.*

Ciotti worked without issue until August of 2015 when she gave birth to a daughter and began experiencing postpartum depression. *Id.* ¶ 19. Ciotti was prescribed Prozac and Seroquel and returned to work at the conclusion of maternity leave. *Id.*

In January of 2016, Ciotti and a fellow NYPD officer were drinking alcohol together while off-duty. *Id.* ¶ 20. At some point, Ciotti appeared to have an anxiety attack, and Emergency Medical Services was called for assistance. *Id.* The NYPD classified the event as an "off-duty incident" related to alcohol usage and initiated a disciplinary investigation. *Id.* ¶ 21. The NYPD's Disciplinary System Penalty Guidelines (the "Disciplinary Guidelines") outline the disciplinary process for officers accused of misconduct. *Id.* ¶ 15. Pursuant to the Disciplinary Guidelines, the Director of the Counseling Services Unit ("CSU") has the absolute discretion to mandate psychiatric treatment for an officer. *Id.*

After her "off-duty incident" related to alcohol usage, Ciotti's gun and badge were taken, she was reassigned from patrol duty to administrative duty, she was ordered to undergo treatment with the CSU, and she was ordered to attend an outpatient mental health facility. *Id.* ¶ 21.

In April 2016, Ciotti's CSU caseworker "told [Ciotti] that she might be sent to inpatient rehabilitation." *Id.* ¶ 22. In response, Ciotti explained that this was impossible, as she was the single mother of a newborn and was already suffering from postpartum depression and anxiety. *Id.* Ciotti's CSU caseworker allegedly responded that he "[did]n't give a shit," and said, "my wife had three kids, and she was fine." *Id.* Ciotti began crying, and her CSU caseworker allegedly told her she could go "plead [her] case" with the commanding officer of the Medical Division, Inspector John Benoit. *Id.*

Also in April, Ciotti arranged a meeting with Inspector Benoit.  *Id.* ¶ 23.  As an NYPD officer, Ciotti is a member of the New York City Police Benevolent Association ("PBA") and was entitled to have a union representative accompany her to the meeting. *Id.* ¶ 13.  Union representatives are tasked with guiding officers through the disciplinary process.  *Id.* ¶ 21.  Officer Jamie Angelastro and PBA trustee Pat Hendry accompanied Ciotti to the meeting, purportedly as her advocates.  *Id.*  Angelastro was the union representative at the 100th precinct, where he and Ciotti both worked.  *Id.* ¶¶ 23, 114.  At the meeting, Ciotti stated that "she did not suffer from alcohol addiction and she did not want to be separated from her baby."  *Id.*  ¶ 23.  In response, Inspector Benoit allegedly joked that Ciotti was "too pretty to be alcoholic," but that "she had to go [to the inpatient facility] anyways."  *Id.*  Angelastro and Hendry "laughed along with [Inspector] Benoit." *Id.*

On April 21, 2016, Angelastro asked Ciotti to meet him at a bar to "discuss her situation."  *Id.* ¶ 24.  Ciotti agreed to meet, and confided in Angelastro about her difficulties with postpartum depression.  *Id.* ¶ 25.  Angelastro suggested he could help Ciotti avoid transfer to the inpatient facility if she engaged in a sexual relationship with him.  *Id.* ¶ 26.  Angelastro explained that "he knew how to get out of trouble," bragging that he had previously made an ex-girlfriend's domestic violence complaint against him "go away," and that "he had been discharged by the Air Force for rape and still got this job."  *Id.*  Ciotti left the meeting even more fearful and uneasy than she had been before. *Id.* ¶ 28.  While she was disgusted by Angelastro's behavior, she felt that she needed to develop a friendly relationship with him so as to avoid further discipline.  *Id.*

On April 26, Ciotti reached out to Angelastro for advice regarding her disciplinary proceedings.  *Id.* ¶ 29.  Angelastro offered to help and invited Ciotti over to his house.  *Id.* She was speaking with Angelastro in his kitchen when Angelastro "lunged at her, pressed his erect penis against her, and tried to forcibly kiss her."  *Id.* ¶ 30.  Ciotti fought him off and fled.  *Id.*  After this assault, Angelastro began to call and text Ciotti incessantly.  *Id.*

¶ 31.  He allegedly warned Ciotti that her job was in jeopardy, adding "I'll help you out if you help me out."  *Id.*  Ciotti did her best to avoid Angelastro.  *Id.*

In late April, Ciotti was informed that she would have to attend a month of inpatient rehabilitation, which she ultimately completed in May of 2016.  *Id.* ¶ 32.  Ciotti returned to work in June, where she remained on administrative duty.  *Id.*

In June 2016, after returning from inpatient rehabilitation, Ciotti began to spend time with another female officer at the 100th precinct, Danielle Campo.  *Id.* ¶ 95.  Ciotti and Campo became close friends and Ciotti disclosed to Campo that she was being harassed by Angelastro.  *Id.* ¶ 96.  In turn, Campo shared that she was also being harassed by an officer at the 100th precinct, Paul Marecki, and that, since 2014, Marecki had continued to make inappropriate comments to her, both in person and through harassing text messages.  *Id.* ¶¶ 97–98.

Campo shared with Ciotti that as early as January 2016, she complained multiple times to her supervisor about Marecki's unrelenting harassing conduct, who simply laughed it off.  *Id.* ¶ 100.  Based on her own experiences, Campo warned Ciotti not to file complaints about Angelastro's sexual harassment.  *Id.* ¶ 101.  After hearing about Campo's experience reporting harassment to her supervisor, Ciotti was further compelled to remain silent about Angelastro's ongoing harassment.  *Id.* ¶ 103.[2]

---

[2] The harassment Campo experienced only escalated when, in 2017, another officer—Jon Mercado—also began sexually harassing Campo.  *Id.* ¶ 102.  Finally, on April 1, 2018, Campo broke her silence and complained to the Internal Affairs Bureau ("IAB") about relentless sexual harassment by Marecki.  *Id.* ¶ 104.  Campo was transferred out of her unit shortly after filing her complaint, and was told that she was being transferred because no other officers wanted to work with her.  *Id.* ¶ 107.  However, Campo's shifts were changed so that she worked only on the most undesirable assignments, such as transporting hospitalized prisoners.  *Id.*  On May 10, 2018, Campo formally complained to the Equal Employment Opportunity Division ("EEOD") of the NYPD, detailing the sexual harassment and sexual assault; Campo was then transferred to undesirable platoon shifts, allegedly in retaliation for complaining about the harassment.  *Id.* ¶¶ 108–09.  Thereafter, Campo was advised that the EEOD investigation had been referred in its entirety to the IAB; however, IAB failed to take any action to stop the continued sexual harassment by Marecki and Mercado or the ongoing retaliation Campo was experiencing.  *Id.* ¶ 110.  Ultimately, in 2019, Campo filed suit against New York City, Marecki, Mercado, and other individual defendants, alleging discrimination and retaliation pursuant to various statutes.  *Id.* ¶ 111 (citing *Campo v. City of New York*, No. 19 Civ. 4364 (NGG) (SJB), 2022 WL 970730 (E.D.N.Y. Mar. 31, 2022)).  On summary judgment, the court

In the meantime, Angelastro's harassment of Ciotti only intensified. *Id.* ¶ 34. In addition to calls and texts, he began showing up at Ciotti's location uninvited outside of work. *Id.* One night in August 2016, Ciotti met fellow officer Janet Arneo at a local restaurant while off-duty. *Id.* ¶ 35. A recent increase to her anti-depressant dosage resulted in Ciotti having an outsized reaction to the few drinks she had. *Id.* She soon felt "extremely disoriented and impaired, and struggled to speak or move." *Id.* At some point, Angelastro appeared at the restaurant. *Id.* ¶ 36. He then took the intoxicated Ciotti to a motel where he raped her. *Id.* ¶¶ 36–37. The next morning, Ciotti called Officer Arneo and told her that Angelastro had raped her. *Id.* ¶ 38. Officer Arneo laughed and said, "I've known [Angelastro] since high school, and that's how he is." *Id.* This reaction embarrassed Ciotti, and she decided not to report the rape. *Id.* After this experience, Ciotti experienced various major depressive and anxious episodes. *Id.* ¶ 39.

Thereafter, Angelastro continued to tell Ciotti he had friends in the NYPD that could "make [her] problems go away." *Id.* ¶ 40 (alteration in original). Ciotti, scared of the consequences she might face for refusing Angelastro's advances, agreed to meet him on several occasions. *Id.* When they did meet, Angelastro would pressure Ciotti to drink heavily before engaging in sexual activity with her when she was impaired. *Id.* ¶ 41.

On one occasion in October 2016, Angelastro attacked Ciotti in the street and attempted to shove his hand down the front of her pants. *Id.* ¶¶ 42–43. Ciotti pushed his hand away and shouted "get the fuck off me," then she ran home and locked the door behind her. *Id.* ¶ 44.

Ciotti finally cut off contact with Angelastro, realizing that he was exploiting her vulnerability and job insecurity. *Id.* ¶ 46. Ciotti tried to get her life back to normal, and

---

dismissed Campo's *Monell* claims against the City, however it allowed her retaliation and hostile work environment claims against the City and individual defendants to proceed. The case was ultimately settled on September 23, 2022.

she was taken off of administrative duty and allowed to resume patrol duty in January of 2017. *Id.* ¶¶ 47–48.

On August 31, 2017, Ciotti attended a police convention. *Id.* ¶ 51. Because the convention was located upstate, she rented a house with another officer at her precinct, Sergeant Deanna Dandrea, and her husband Phil Dandrea. *Id.* Unbeknownst to Ciotti, Angelastro had been invited to stay in the house as well. *Id.* ¶ 52. That night at the rental house, Angelastro raped Ciotti, with his loaded gun next to her on the bed. *Id.* ¶ 53–55. At one point during this encounter, Ciotti told Angelastro that she would report him if he did not leave her alone. *Id.* ¶ 57. This angered Angelastro, who threw Ciotti to the ground and began to strangle her. *Id.* ¶¶ 58–59. Hearing Ciotti's screams, Sergeant Dandrea ran into the room, pulled Angelastro off of Ciotti and ordered him to leave, which he did. *Id.* ¶ 60. The next day, Ciotti emailed Angelastro about the escalating violence, writing: "You put your hands on me like I'm a rag doll and sit there like a bitch and make excuses. You will never ever speak to me, or look at me at work. I should have socked the shit out of you for ripping my hair out. A true piece of shit you are." *Id.* ¶ 62.

In September 2017, Ciotti spoke to her immediate supervisor, Lieutenant David Cordano, about transferring to a different precinct, away from Angelastro. *Id.* ¶ 63. Specifically, Ciotti told Lieutenant Cordano that she needed to transfer "because of an incident that happened." *Id.* To Ciotti's surprise, Lieutenant Cordano said that he knew what she was talking about. *Id.* ¶ 64. He had heard about "it" from Officer Arneo and Sergeant Dandrea. *Id.* Ciotti understood this to mean that Lieutenant Cordano was aware that Angelastro had raped Ciotti on multiple occasions. *Id.* ¶ 65. As her supervisor, Lieutenant Cordano was responsible for escalating such complaints, but he did not—nor did he respond to Ciotti's transfer request. *Id.*

From December 2017 to January 2018, Angelastro's harassment continued. *Id.* ¶¶ 68–70. In January of 2018, Ciotti decided to report Officer Angelastro's again, this time

to her supervisor in the Domestic Violence Unit, Sergeant Tamra Diaz. *Id.* ¶ 71. Ciotti "explained everything that had happened between her and Angelastro, including how Angelastro assaulted her"; Sergeant Diaz was shocked at how Angelastro had "preyed" on Ciotti and promised to escalate Ciotti's complaint. *Id.* ¶¶ 71–72.

On January 25, 2018, Ciotti received a call from the precinct's Integrity Control Officer, Lieutenant Kathleen Van Buren, to discuss the situation. *Id.* ¶ 73. Lieutenant Van Buren promised to "take care of the situation and notify the precinct's Captain, Janice Holmes." *Id.* ¶ 74. The next day, the IAB called Ciotti to request a formal interview. *Id.* ¶ 75. The IAB is the NYPD unit responsible for investigating officer misconduct. *Id.* ¶ 14.[3] Ciotti sat for the interview the same day. *Id.* ¶ 75. Angelastro was again placed on administrative duty shortly thereafter. *Id.* ¶ 76.

On February 6, 2018, Angelastro underwent a mandatory counseling session with Dr. Catherine Lamstein of the CSU. *Id.* ¶ 77. During the session, Angelastro denied Ciotti's allegations and told Dr. Lamstein that Ciotti was mentally unstable. *Id.* ¶ 78. As a result of Angelastro's statements, Ciotti was immediately placed on restricted duty and had her gun and badge taken away the next day. *Id.* ¶ 80. This indicated that Angelastro's accusations against Ciotti were considered credible and had near immediate effect, while the NYPD gave "no meaningful effect" to Ciotti's complaints of multiple rapes and ongoing abuse. *Id.* ¶ 81. On February 7, 2018, Lamstein called Ciotti to gather information about Ciotti's accusations against Angelastro and allegedly blamed Ciotti for Angelastro's behavior. *Id.* ¶ 82. When Ciotti explained that Angelastro had raped, assaulted, and stalked her, Lamstein responded, "I don't understand why you don't just

---

[3] Ciotti alleges the IAB has a history of "intentionally mishandling sexual harassment investigations, leaking confidential information, and retaliating against those who make complaints by transferring them, demoting them, and sending them to NYPD's Psychology Unit." FAC ¶ 14. In support, she cites to a 2010 news article published in *The Village Voice*, which describes the IAB's alleged deficiencies and various accusations made against it. *Id.* n.5. Ciotti additionally cites to news articles for the allegation that police unions have historically "wielded their significant political power to suppress reform and shield officers from accountability for their misconduct against civilians and fellow officers alike." *See* FAC ¶ 13 and n.1–4.

block his number." *Id.* The next day, Ciotti went to Family Court to obtain an Order of Protection (the "February 2018 Order") against Angelastro. *Id.* ¶ 84. Angelastro promptly violated the restraining order against him by continuously calling, texting, and emailing Ciotti, as well as by "driving past her house and then following her car" on one occasion. *Id.* ¶ 85. Ciotti reported these violations to the Long Beach and Nassau Police Departments who did nothing. *Id.* ¶ 84.

Later that month, in February 2018, Captain Holmes assigned Ciotti to cell attendant duty. *Id.* ¶ 86. Officers assigned to cell attendant duty are responsible for "searching and monitoring detainees at the precinct detention cells, reporting any unusual activity to the desk officer, attending to the personal needs of the detainees, maintaining safety of the detention cells, keeping accurate records of detainees in the detention cells, and performing other clerical or administrative duties as directed." *Id.* ¶ 87. Captain Holmes told Ciotti she could not leave the cell for any reason, even if there were no detainees being held at the precinct. *Id.* ¶ 88. This was not typical of cell duty. *Id.* The result was that Ciotti spent hours each day sitting alone. *Id.*

The same week that Ciotti was assigned to cell duty, her partner—Officer Joe Ferrari—was removed from patrol duty. *Id.* ¶ 89. When Officer Ferrari asked if he was being reassigned because of Ciotti's complaints against Officer Angelastro, Captain Holmes responded, "Yes." *Id.* ¶ 90.

In early March 2018, Ciotti received a phone call from Nassau County detective, Sergeant Bill Hussain, who told her to stop reporting Angelastro for violating the February 2018 Order. *Id.* ¶ 91. Ciotti told Sergeant Hussain about her experiences with Angelastro, going back to 2016, to which he responded, "[n]o one likes to arrest cops, sweetie," leaving Ciotti hopeless. *Id.* ¶¶ 91–92.

In mid-March 2018, Sergeant Dandrea—responsible for officer schedules at the time—transferred Ciotti from the day shift to the night shift. *Id.* ¶ 93. Ciotti explained that she could not work the night shift as she had no one to watch her daughter during

that time.  *Id.*  Sergeant Dandrea refused to change the schedule.  *Id.*  Ciotti made multiple requests to transfer back to the day shift, but stopped when Sergeant Dandrea threatened to "transfer Ciotti to another location" if the requests continued.  *Id.* ¶ 94.

In May 2018, Captain Holmes transferred Ciotti to the Narcotics Unit in Brooklyn.  *Id.* ¶ 112.  The Narcotics Unit is known within the NYPD as a location where officers are sent as a form of discipline.  *Id.*  Despite this, working in the Narcotics Unit gave Ciotti distance from Angelastro and she soon realized she did not want to return to her old precinct.  *Id.* ¶ 113.  Without any meaningful action by the NYPD to protect her, Ciotti submitted a formal request to be transferred from the 100th precinct to the 101st precinct.  *Id.* ¶ 114.

In August 2018, Ciotti learned that Angelastro had been reinstated, and his gun and badge returned.  *Id.* ¶ 115.  Ciotti called the IAB to complain, explaining that Angelastro had violated an order of protection she had against him multiple times and that she had serious concerns for her safety.  *Id.* ¶ 116.  The IAB recorded her statement but took no further action.  *Id.*

In October 2018, Ciotti was transferred to the 101st precinct.  *Id.* ¶¶ 118–19.  Around this same time, Ciotti experienced a sharp pain in her chest that was so intense it affected her breathing as well as her motor skills.  *Id*. ¶ 118.

On November 12, 2018, Angelastro called several officers at the 101st precinct to ask about Ciotti.  *Id.* ¶ 123.  Ciotti reported these calls to the Captain of the 101st precinct, Erik Robinson.  *Id.* ¶ 124.  Captain Robinson responded, "I don't want any trouble for you.  So, I'm going to have you voucher your gun for the next week or so at night.  I know [Angelastro] is crazy and I don't want you getting into anything serious with him."  *Id.* (alteration in original).  Ciotti agreed to store her gun at the precinct.  *Id.*

Two days later, Ciotti became aware that Angelastro had filed an order of protection against her.  *Id.* ¶ 126.  In his petition for the order, Angelastro falsely alleged that Ciotti had appeared uninvited at his residence threatening to kill him.  *Id.*  Ciotti was

called into a meeting with Captain Robinson. *Id.* ¶ 127. Also present were union representatives Officer Ed Moore and Officer Matt Beigay. *Id.* Ciotti was told that she was once again being placed on modified duty, and her gun and badge were again confiscated due to Angelastro's order of protection against her. *Id.* She was also informed that she was being transferred immediately. Her transfer had been personally ordered by the chief of the IAB, who wanted her removed from the 101st precinct. *Id.* Ciotti was transferred to Viper 8, where she would be responsible for monitoring surveillance cameras in public housing areas. *Id.* ¶ 128.

In January 2019, Ciotti obtained another order of protection against Officer Angelastro (the "January 2019 Order") from Nassau County Family Court. *Id.* ¶ 121. She called union representative Officer Joe Rao and expressed her fear that Angelastro might retaliate against her for filing for the order. *Id.* ¶ 122. When Officer Rao tried to convince her to drop the order, Ciotti refused: "I'm not going to drop it. All of you are only looking out for [Angelastro]." *Id.* (alteration in original). Officer Rao responded, "Go fuck yourself." *Id.*

In September 2020, nearly two years after Ciotti was placed on modified duty, she returned to the 101st precinct. *Id.* ¶ 129.

In June 2021, Angelastro falsely reported that Ciotti had appeared at his house in violation of the order of protection. *Id.* ¶¶ 132, 135. Ciotti subsequently spoke to union representative Officer Beigay about filing a temporary restraining order against Angelastro. *Id.* ¶ 137. Officer Beigay dissuaded her from doing so, warning, "[Y]ou really shouldn't go back to court. It's not going to end well for you." *Id.*

In December 2021, Ciotti was on patrol duty when a van pulled up next to her. *Id.* ¶ 139. Ciotti recognized the driver of the van as Al Farina, Angelastro's roommate. *Id.* Farina began to yell at Ciotti, "Do you remember me, bitch?" *Id.* Ciotti called for back-up and Farina was taken to the police station. *Id.* Ciotti filed a criminal complaint of harassment against Farina and reported the incident to the IAB. *Id.* When Ciotti told

Captain Robinson that she wanted Farina arrested for stalking and aggravated harassment, Captain Robinson told Ciotti to "let it go." *Id.* ¶ 140.

In August 2022, Ciotti consulted with a neurologist, Dr. Kristin Waldron, regarding the increased neck pain and migraines she had been experiencing. *Id.* ¶ 142. Dr. Waldron diagnosed Ciotti with cervicogenic migraine disease, likely caused by the neck injury Ciotti suffered when Angelastro strangled her five years earlier on August 31, 2017, when they attended the police convention. *Id.* Ciotti submitted Dr. Waldron's report to NYPD medical services. *Id.* ¶ 143. She was placed on restricted duty due to her injury and "thereafter performed administrative tasks at the front desk of the 101st precinct." *Id.*

In February 2023, Ciotti discovered she was experiencing a high-risk pregnancy. *Id.* ¶¶ 145–46. The next month, Ciotti miscarried. *Id.* ¶ 148. Soon after this, Ciotti had to undergo "extremely difficult" dilation and curettage surgery. *Id.* Her mental health suffered tremendously as a result of these events. *Id.*

In April 2023, Ciotti sought support for postpartum depression from the NYPD's Police Organization Providing Peer Assistance ("POPPA"). *Id.* ¶ 150. The POPPA representative advised Ciotti to seek treatment from the CSU. *Id.* Ciotti explained that she feared retaliation from the CSU psychologists and told the POPPA representative to "just forget [she] ever called" before hanging up. *Id.* However, the POPPA representative breached confidentiality and informed the NYPD that Ciotti was suffering from "ongoing mental illness which required treatment." *Id.* ¶ 151.

The next day, NYPD's Medical Division ordered Ciotti to report to Dr. Lamstein—the same doctor who she had seen in February, 2018—in the CSU. *Id.* ¶ 152. Ciotti emailed the director of the psychology department, Dr. Adam Bloom, to request a different CSU doctor for her mandated treatment, but he failed to respond. *Id.* ¶¶ 152–53. Thus, Ciotti met with Dr. Lamstein as required. *Id.* ¶ 154. She explained that she had recently experienced a miscarriage and was struggling with postpartum depression. *Id.*

Dr. Lamstein ignored this, and instead interrogated Ciotti about her relationship with Angelastro. *Id.* ¶ 155.  Ciotti explained that her recent struggles were unrelated to Angelastro and instead stemmed from her postpartum depression. *Id.*  At the end of the session, Dr. Lamstein concluded that Ciotti had an unstable mental history and placed her on involuntary leave. *Id.* ¶ 156.  Ciotti again contacted Dr. Bloom to request a different CSU doctor. *Id.* ¶ 157.  This time, Dr. Bloom responded that Ciotti would be suspended if she did not meet with Dr. Lamstein. *Id.*

In June 2023, Ciotti reported to the CSU for one of her mandated sessions. *Id.* ¶ 158.  While in the waiting room, Ciotti overheard the director of the CSU, Dr. Tremaine Sayles, loudly recounting Ciotti's medical history to other doctors. *Id.*  When Ciotti asked Dr. Sayles to stop sharing her medical information, Dr. Sayles simply ordered Ciotti to return to the waiting room. *Id.*  After an hour of waiting, Ciotti realized she needed to leave to pick up her daughter from school. *Id.*  She explained this to the CSU receptionist, making it clear that she planned to return for her session. *Id.*  Shortly after leaving, Ciotti received a call from her CSU caseworker, who said, "[Dr. Sayles] wants you suspended for causing a scene and then leaving." *Id.* ¶ 159.  Ciotti subsequently filed a complaint with the EEOD against Dr. Sayles for disclosing her medical information and threatening to suspend her. *Id.*

At the start of July 2023, Ciotti received another call from her CSU caseworker, who informed her that, pursuant to Dr. Sayles' orders, Ciotti was to undergo regular urine testing, attend individual therapy three times a week, and attend group therapy once a week. *Id.* ¶ 160.  Ciotti expressed confusion at this new treatment plan, particularly with regard to the urine testing. *Id.*  The CSU caseworker responded, "[t]hat's just what I was told to tell you.  I don't know why they referred you to the counseling unit.  You really shouldn't be here because your case doesn't involve any off-duty incidents or any instances with drugs or alcohol.  Look, just play their game." *Id.*  When Ciotti asked if "all this" was being done in retaliation for her EEOD complaint against Dr. Sayles, the

CSU caseworker replied, "[y]eah, probably." *Id.* ¶ 161.  On July 10, Ciotti experienced her heart racing and pain in her chest; she was rushed to the emergency room, where the attending physician informed her she was suffering from a panic attack. *Id.* ¶ 162.

On August 10, 2023, Ciotti filed a second EEOD complaint against Dr. Sayles for retaliating against her for filing the first complaint. *Id.* ¶ 163.  That evening at approximately 10:00 p.m., Ciotti and her family were asleep at home when they were woken by pounding at the door. *Id.* ¶ 164.  Ciotti opened it to find two IAB officers who wanted to speak to Ciotti about her EEOD complaint. *Id.*  They interviewed Ciotti in her living room that night, which Ciotti understood as an act of intimidation. *Id.* ¶¶164–65.

In September 2023, during one of Ciotti's mandated counseling sessions with Dr. Lamstein, Dr. Lamstein asked Ciotti, "Did Angelastro assault you in your home?" *Id.* ¶ 166.  The sudden and unprompted mention of Angelastro caused Ciotti unwarranted stress and anxiety. *Id.*

Ciotti alleges that her suffering is ongoing. *Id.* ¶ 167.  She is scared that Angelastro, who owns multiple firearms, will attack her or her family. *Id.* ¶ 168.  She is in near constant pain from cervicogenic migraine disease and experiences severe emotional distress—feelings of humiliation, depression, anxiety, and fear—on a daily basis. *Id.* ¶ 167.  She alleges that her career has been negatively impacted by Angelastro's conduct, and that the NYPD has failed to take any remedial action and has, instead, retaliated against her. *Id.* ¶ 168.

### B.  Procedural Background

Ciotti filed her initial complaint with this Court on November 22, 2023, against the City and Angelastro.  Doc. 1.  On that same day, she filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), and on December 27, 2023, the EEOC issued Ciotti a Notice of Right to Sue. *See* FAC ¶¶ 10–11.  On February 8, 2024, she filed an amended complaint in the instant action.  Ciotti brings her claims

pursuant to the New York State Adult Survivors Act, which creates a one-year revival period for claims of sexual assault that would otherwise be time-barred. FAC ¶¶ 169–70.

As to Angelastro, Ciotti asserts two causes of action, alleging (1) sexual assault and battery, and (2) gender-motivated violence in violation of the New York City Victims of Gender-Motivated Violence Protection Law (the "GMVA"). *Id.* ¶¶ 217–21, 254–60. On July 17, 2024, a clerk's certificate of default was entered with respect to these claims. Doc. 31.

As to the City, Ciotti asserts 13 causes of action, composed of the following claims: (1) 42 U.S.C. § 1983 *Monell* liability (under formal policy, *de facto* policy or custom, and failure to train theories) for equal protection and due process violations; (2) discrimination (under disparate treatment and hostile work environment theories) pursuant to Title VII, the Americans with Disabilities Act (the "ADA"), the New York State Human Rights Law ("NYSHRL") and the New York City Human Rights Law ("NYCHRL"); (3) retaliation pursuant to Title VII, the ADA, the NYSHRL, and the NYCHRL; (4) gender-motivated violence in violation of the GMVA; and (5) negligence for its hiring, supervision, and retention of Angelastro. *Id.* ¶¶ 172–253.

The City filed the instant motion to partially dismiss the FAC for failure to state a claim pursuant to Rule 12(b)(6) on May 16, 2024. Doc. 22. The City moves to dismiss all federal claims against it, as well as the claims of retaliation under the NYSHRL and NYCHRL; it does not move to dismiss the claims of discrimination under the NYSHRL and NYCHRL, nor the GMVA and negligence claims. *See* Doc. 23 at 1–2.

## II.    LEGAL STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that

the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). If the plaintiff has not "nudged [her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570; *see Iqbal*, 556 U.S. at 680.

The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)). Indeed, "the purpose of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits" or "weigh[ing] the evidence that might be offered to support it." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (internal quotation marks and citation omitted). Thus, when ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014).

In considering a Rule 12(b)(6) motion, a district court may also consider "documents attached to the complaint as exhibits[ ] and documents incorporated by reference in the complaint." *Doe v. New York University*, No. 20 Civ. 1343 (GHW), 2021 WL 1226384, at *10 (S.D.N.Y. Mar. 31, 2021) (quoting *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010)).

## III.   DISCUSSION

### A.   Title VII & ADA Claims

#### 1.   Timeliness

A plaintiff bringing suit under Title VII or the ADA must exhaust her administrative remedies by filing a complaint with the EEOC within 300 days after the

alleged unlawful employment act occurred.  42 U.S.C. §§ 2000e-5(e)(1) (Title VII),[4]

12117(a) (ADA); *see Partlan-Hurson v. Westchester Community College*, 804 F App'x

41, 43 (2d Cir. 2020).  This "300-day rule" operates as a statute of limitations, barring all

claims arising outside of it.  *See Banks v. General Motors, LLC*, 81 F.4th 242, 259 (2d

Cir. 2023).  Ciotti filed her EEOC charge on November 22, 2023, and obtained her right

to sue letter on December 27, 2023.  FAC ¶¶ 10–11.  Thus, while the City concedes that

Ciotti's Title VII and ADA claims are timely insofar as they assert claims on or after

January 26, 2023 (exactly 300 days before November 22, 2023), claims arising from acts

occurring before that date would normally be time-barred.  Doc. 23 at 10.  Ciotti,

however, argues that the continuing violation doctrine applies to revive those otherwise

time-barred claims.  *See* Doc. 25 at 9–11.

      Under the continuing violation doctrine, a plaintiff may bring claims for

discriminatory acts that would have been barred by the statute of limitations, "so long as

they either are 'sufficiently related' to incidents that fall within the statutory period or are

part of a systematic policy or practice of discrimination that took place, at least in part,

within the limitations period."  *National Railroad Passenger Corp. v. Morgan*, 536 U.S.

101, 105 (2002).  The continuing violation doctrine applies to claims involving an

"ongoing discriminatory policy or custom," *Chin v. Port Authority of New York & New

Jersey*, 685 F.3d 135, 156 (2d Cir. 2012), but does not apply to "discrete acts," such as

"termination, failure to promote, denial of transfer, or refusal to hire," where "[e]ach

incident of discrimination and each retaliatory adverse employment decision constitutes a

---

[4] The EEOC provides that charges must be filed "within one hundred and eighty days after the alleged
unlawful employment practice occurred . . . except that in a case of an unlawful employment practice with
respect to which the person aggrieved has initially instituted proceedings with a State or local agency . . .
such charge shall be filed . . . within three hundred days after the alleged unlawful employment practice
occurred, or within thirty days after receiving notice that the State or local agency has terminated the
proceedings under the State or local law, whichever is earlier[.]"  42 U.S.C. §§ 2000e-5(e)(1).  Here, it is
unclear from the record whether Ciotti filed a charge with a State or local agency, in addition to the U.S.
EEOC.  *See* FAC ¶¶ 10–11.  However, the City asserts—and Ciotti does not dispute—that the 300-day
timeframe applies to Ciotti's claims.  *See* Doc. 23 at 10.

separate actionable 'unlawful employment practice.'" *Morgan*, 536 U.S. at 114; *see also*

*Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015).

Hostile work environment claims often fall within the continuing violation

exception because:

> Hostile environment claims are different in kind from discrete acts. Their very
> nature involves repeated conduct . . . . The "unlawful employment practice" . . .
> occurs over a series of days or perhaps years and, in direct contrast to discrete acts,
> a single act of harassment may not be actionable on its own. . . . Such claims are
> based on the cumulative effect of individual acts.

*Morgan*, 536 U.S. at 115; *see also Banks*, 81 F.4th at 259–60 (internal quotation marks

and citation omitted) ("Claims alleging a hostile work environment require a different

analysis than discrimination or retaliation claims because their very nature involves

repeated conduct.") Applying the continuing violation doctrine to a hostile work

environment claim, "so long as an act contributing to the claim occurs within the filing

period, the entire time period of the hostile environment may be considered by a court for

the purposes of determining liability." *Banks*, 81 F.4th at 260 (quoting *Morgan*, 536 U.S.

at 117). Thus, if a plaintiff sufficiently alleges a hostile work environment claim, "the

commencement of the [statute of limitations] period may be delayed until the last

discriminatory act in furtherance of it." *James v. Van Blarcom*, 782 F. App'x 83, 84 (2d

Cir. 2019) (summary order) (quoting *Washington v. County of Rockland*, 373 F.3d 310,

317 (2d Cir. 2004)); *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 76 (2d Cir. 2010).

Under Title VII and the ADA, Ciotti alleges discrimination—pursuant to both

disparate treatment and hostile work environment theories—as well as retaliation. With

regards to timeliness, Ciotti alleges that her Title VII discrimination and retaliation claims

extend before 2023 because the discriminatory and retaliatory conduct at issue is part of a

hostile work environment that is subject to the continuing violation doctrine.[5] Doc. 25 at

---

[5] The Court will assume that, under the heading of "Plaintiff's Title VII and ADA Claims are Timely," that
when Ciotti refers solely to Title VII, she is including her ADA claims in the analysis as well. *See* Doc. 25
at 9–11.

9.  She argues that she has expressly alleged an ongoing policy of discrimination and the existence of an ongoing hostile work environment, whereby the NYPD ignored her complaints of harassment; actively dissuaded her from filing more complaints with subtle threats; and, when she did complain, used various means, including the counseling services, "to cow her or subject her to intolerable treatment."  Doc. 25 at 10; *see also* FAC ¶¶ 83–85, 91, 116, 122, 127, 130–35, 138–39, 151–55, 158–60, 163–64, 166.  Ciotti alleges that she has been subject to that policy since 2018, and that same policy has been implemented against her as recently as 2023.  Doc. 25 at 10; *see also* FAC ¶¶ 150–166. Ciotti asserts that, since her 2018 complaint of sexual harassment,[6] she was "punished by the NYPD at every possible opportunity," for example:

- On February 7, 2018, within two weeks after Ciotti reported the rape and sexual assault to her supervisors in the NYPD, Ciotti's gun and badge were taken away.  Doc. 25 at 10 (citing FAC ¶ 80);

- On a February 7, 2018 call, Dr. Lamstein "berated Ciotti over being assaulted and blamed her for her own assault."  *Id.* (citing FAC ¶ 82);

- In March 2018 and January 2019, respectively, Ciotti was "reprimanded for obtaining" the 2018 and 2019 Orders of Protection against Angelastro and "further reprimanded for reporting . . . Angelastro's multiple violations of her Orders of Protection."  *Id.* (citing FAC ¶¶ 91, 121, 122);

- In late April or early May 2023, Ciotti's "confidentiality was breached, and [she] was reported to the MSU after self-reporting to POPPA that she suffered from postpartum depression."  *Id.* (citing FAC ¶ 151);

- In late April or early May 2023 "Lamstein ignored Ciotti's postpartum depression and berated her again about her sexual assault from years prior." *Id.* (citing FAC ¶ 155);

- In late April or early May 2023 "Lamstein declared Ciotti 'mentally unstable' only for her history of being sexually assaulted and placed her on immediate leave."  *Id.* (citing FAC  ¶ 156);

- In June 2023, Ciotti "was retaliatorily sent to the CSU for no medical reason." *Id.* at 11 (citing FAC ¶ 158);

---

[6] While Ciotti does not specify which 2018 "complaint of sexual harassment" she refers to here, the FAC references numerous complaints Ciotti made in 2018, as early as January.  *See, e.g.*, FAC ¶¶ 71, 73–75, 82–84, 91–92, 116, 124.

- ▪ "In response to [Ciotti's] EEO[D] Complaint, at approximately 10 p.m. in the evening of August 10, 2023, officers from the IAB showed up at her home and demanded to conduct an impromptu interview in her living room in an attempt to intimidate Plaintiff.  No further action was taken to correct Sayles' behavior or put an end to her forced medical treatment."  *Id.* (citing FAC ¶ 164).

- ▪ Dr. Lamstein "again brought up Angelastro's assault of [Ciotti]" at a counseling session in September of 2023.  *Id.* (citing FAC ¶ 166).

*See also* Doc. 25 at 10–11 (listing other instances, in addition to those listed above, that Ciotti alleges contributed to the punishment she received by the NYPD, starting in 2018). Therefore, she asserts that her Title VII and ADA claims should include conduct and violations of her rights prior to 2023.  *Id.*

The City argues that Ciotti's continuous violation theory fails because her complaint is premised primarily on discrete acts that are not sufficiently related.  Doc. 26 at 1.  While it is not clear which part of the City's analysis is relevant for the Title VII and ADA claims, *see* Doc. 26, the City proffers that Ciotti's allegations arose from two distinct periods stemming from different actors and triggering events:  "(1) Ciotti's 2018 allegations of retaliatory transfers/shift changes were acts taken by uniform NYPD service members after [she] complained of Angelastro's assault, and (2) [Ciotti's] allegations regarding CSU's . . . handling of her psychiatric treatment related to an off-duty incident involving alcohol occurring in 2016, [Ciotti's] postpartum depression, and Dr. Sayles' alleged disclosure of confidential information—the latter two occurring primarily in 2023."  *Id.* at 1–2.  The City further argues that, "while [Ciotti] has one allegation regarding CSU in 2018, this allegation is related to Dr. Lamstein's inadequate psychiatric treatment, which is not of the same nature as a retaliatory transfer/shift change."  *Id.*  Thus, they argue that, where Ciotti complains of discrete acts and fails to connect her untimely claims to her timely ones beyond her own conclusory allegations, the continuous violation doctrine cannot be applied.  *Id.*; *see Goodman v. New York City Off-Track Betting Corp.*, No. 97 Civ. 4708 (DAB), 1999 WL 269959, at *5 (S.D.N.Y. May 4, 1999), *aff'd sub nom. Goodman ex rel. Rudinsky v. New York City Off-Track*

*Betting Corp.*, 201 F.3d 431 (2d Cir. 1999); *see also Birch v. City of New York*, 675 F. App'x 43, 44–45 (2d Cir. 2017).

The Court concludes that Ciotti's Title VII and ADA claims for discrimination based on disparate treatment and retaliation "allege[ ] discrete actions—separate instances of alleged unlawful conduct, occurring at different times and under different circumstances, without a non-conclusory factual connection—rather than a common policy under which all the actions were carried out," and thus, the continuing violation doctrine does not apply to these claims. *Jackson v. New York State*, 523 F. App'x 67, 69 (2d Cir. 2013); *see also Mitchell v. Planned Parenthood of Greater New York, Inc.*, No. 23 Civ. 1932 (JLR), 2024 WL 3849192, at *7 (S.D.N.Y. Aug. 16, 2024). However, the Court will consider conduct that occurred before January 26, 2023 in analyzing Ciotti's Title VII and ADA hostile work environment claims, as it finds that Ciotti sufficiently alleges she experienced harassment on a repetitive, continuous basis. *See Fitzgerald v. Henderson*, 251 F.3d 345, 362–63 (2d Cir. 2001); *Feldesman v. Interstate Hotels LLC*, No. 16 Civ. 9352 (ER), 2019 WL 1437576, at *10 (S.D.N.Y. Mar. 31, 2019).

    *2.  Merits*

    *a.  Discrimination Claims*

Ciotti brings discrimination claims pursuant to Title VII on the basis of her gender, sex and pregnancy, and pursuant to the ADA on the basis of her disability or perceived disability of postpartum depression. FAC ¶¶ 195, 206. Employment discrimination claims under Title VII and the ADA are analyzed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Vora v. New York City Department of Education*, No. 22 Civ. 10891 (PGG) (SDA), 2024 WL 1116312, at *6 (S.D.N.Y. Mar. 14, 2024). Under that framework, the question on a motion to dismiss is whether the plaintiff has adequately pleaded a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. The Second Circuit has counseled that, at the pleading stage, a plaintiff faces only a "minimal burden." *Vega*

*v. Hempstead Union Free School District,* 801 F.3d 72, 86 (2d Cir. 2015) (quoting *Littlejohn v. City of New York*, 795 F.3d 297, 310 (2d Cir. 2015)).  In determining whether a complaint meets this standard, the Court "must be mindful of the 'elusive' nature of intentional discrimination."  *Vega*, 801 F.3d at 86 (citing *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 255 n.8 (1981)).  "[R]arely is there 'direct, smoking gun, evidence of discrimination,'" and so a plaintiff "usually must rely on 'bits and pieces' of information to support an inference of discrimination, *i.e.,* a 'mosaic' of intentional discrimination."  *Id.* (internal citations omitted).

Ciotti relies on the same series of events for both a disparate treatment claim (based on one or more specific adverse actions) and a hostile work environment claim (based more generally on the entire course of events underpinning her complaint).  *See* FAC ¶¶ 194–98, 204–10.  Accordingly, the Court will analyze her claim under both discrimination theories.  For the reasons set forth below, the Court finds that while Ciotti has not sufficiently plead that she suffered discrimination based on a disparate treatment theory, she has adequately plead that she suffered discrimination based on a hostile work environment theory.

### i.   *Disparate Treatment Claim*

Under Title VII, "for a discrimination claim to survive a motion to dismiss, 'absent direct evidence of discrimination, what must be plausibly supported by facts alleged in the complaint is that the plaintiff (1) is a member of a protected class, (2) was qualified, (3) suffered an adverse employment action, and (4) has at least minimal support for the proposition that the employer was motivated by discriminatory intent.'"  *Buon v. Spindler*, 65 F.4th 64, 79 (2d Cir. 2023) (quoting *Littlejohn*, 795 F.3d at 311).  The same requirements apply for claims under the ADA, except under the fourth prong, where the plaintiff's disability must be a but-for cause (rather than a motivating cause) of the plaintiff's injury.  *See Natofsky v. City of New York*, 921 F.3d 337, 348 (2d Cir. 2019).

Neither party contests that Ciotti is a member of protected class, nor does the City argue that Ciotti has failed to allege that she was qualified for the position. Instead, the parties contest whether Ciotti has plausibly alleged the third and fourth elements of her Title VII and ADA claims.

With respect to the third element—that Ciotti has alleged she suffered an adverse action—the "landscape has changed with the Supreme Court's decision in *Muldrow v. City of St. Louis*, [601 U.S. 346] (2024)." *Anderson v. Amazon.com, Inc.*, No. 23 Civ. 8347 (AS), 2024 WL 2801986, at *10 (S.D.N.Y. May 31, 2024). In *Muldrow*, the plaintiff claimed that the defendant transferred her from one job to another because of her sex. 601 U.S. at 350. The lower courts granted the defendant's motion for summary judgment, reasoning that "the transfer did not cause [the plaintiff] a 'significant' employment disadvantage." *Id.* The Supreme Court "disapprove[d] that approach," holding that "[a]lthough an employee must show some harm from a forced transfer to prevail in a Title VII suit, she need not show that the injury satisfies a significance test." *Id.* Focusing on the text of Title VII's anti-discrimination provision, the Supreme Court explained that the statutory language "requires [a plaintiff] to show that the transfer brought about some 'disadvantageous' change in an employment term or condition." *Id.* at 354 (citation omitted). In other words, "[t]o make out a Title VII discrimination claim, a transferee must show some harm respecting an identifiable term or condition of employment." *Id.* at 347. "What the transferee does not have to show . . . is that the harm incurred was '*significant*.' Or serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar." *Id.* at 355 (emphasis added) (citation omitted).

While the parties do not explicitly address the holding in *Muldrow*, the Court follows many others in extending the holding in *Muldrow* beyond only Title VII discrimination cases involving *transfers*. *See, e.g., Peifer v. Board of Probation and Parole*, 106 F.4th 270, 277 (3d Cir. 2024) (applying Muldrow to non-transfer case); *Cole*

*v. Group Health Plan, Inc.*, 105 F.4th 1110, 1114 (8th Cir. 2024) (same); *Williams v. Memphis Light, Gas & Water*, No. 23 Civ. 5616 (RSB), 2024 WL 3427171, at *5–6 (6th Cir. July 6, 2024) (same); *Riggs v. Akamai Technologies*, No. 23 Civ. 6463 (LTS), 2024 WL 3347032, at *6 (S.D.N.Y. July 8, 2024) (same).

Courts have also held that *Muldrow* applies to discrimination claims under the ADA, given that the pertinent language in that statute is similar to the pertinent language in Title VII. *See, e.g., Rios v. Centerra Grp. LLC*, 106 F.4th 101, 112–13 (1st Cir. 2024) (applying *Muldrow* to an ADA claim); *Davis v. Orange County*, No. 23 Civ. 12759, 2024 WL 3507722, at *3–4 (11th Cir. 2024) (same). To the extent that pre-*Muldrow* decisions imposed a higher threshold for finding an adverse employment action, those decisions appear to no longer be good law. *Mitchell*, 2024 WL 3849192, at *9 (quoting *Packer ex rel. 1-800-Flowers.Com, Inc. v. Raging Capital Management, LLC*, 105 F.4th 46, 54 n.36 (2d Cir. 2024) ("In rare cases, a district court can decline to follow our precedent if it concludes that an intervening Supreme Court decision has so clearly undermined our precedent that it will almost inevitably be overruled.").

Ciotti claims the following adverse employment actions in 2023: (1) that she was subjected to unnecessary medical treatment, including urine testing and counseling, and (2) that she was placed on involuntary leave. Doc. 25 at 21–23. She argues that these constitute adverse employment actions, relying on *Inserillo v. City of New York et al.*, No. 13 Civ. 3306 (RJD) (CLP), Min. Entry dated May 12, 2024 (E.D.N.Y.), and *Tillery v. New York State Office of Alcoholism & Substance Abuse Servs.*, 739 F. App'x 23, 27 (2d Cir. 2018). Doc. 25 at 22. In *Inserillo*, where forced alcohol counseling was one of the alleged adverse employment actions, the district court denied the defendant's motion to dismiss. *Id.* (citing *Inserillo*, No. 13 Civ. 3306). However, as the City points out, the district court never issued a written opinion explaining the basis for its denial of the

motion to dismiss.[7]  Doc. 26 at 7.  *Tillery* is similarly unpersuasive as the portion Ciotti relies on concerns a retaliation claim, and a more flexible standard for "adverse employment actions" that is unique to the retaliation context.  *See* Doc. 25 at 22; *see Vega*, 801 F.3d at 90 (quoting *Burlington Northern & Santa Fe Railway Co. v. White,* 548 U.S. 53, 57 (2006)) ("The Supreme Court has held that in the context of a Title VII retaliation claim, an adverse employment action is any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'  This definition covers a broader range of conduct than does the adverse-action standard for claims of discrimination under Title VII.").

The City argues that allegations of involuntary leave and forced medical treatment do not constitute adverse actions.  Doc. 23 at 18.  In terms of her involuntary leave, the City argues that a paid leave of absence does not constitute an adverse employment action, even if involuntary, and Ciotti does not allege that the leave was unpaid.  Docs. 23 at 18.  In terms of her forced medical treatment, the City argues that this does not qualify as an adverse employment action, relying on *Jackson v. City University of New York*, No. 05 Civ. 8712 (JSR), 2006 WL 1751247 (S.D.N.Y. June 23, 2006), and *Hoeffner v. County of Orange*, No. 17 Civ. 9344 (VB), 2020 WL 1165851, (S.D.N.Y. Mar. 10, 2020).  Doc. 26 at 7.  Both of these cases find that requiring a plaintiff to undergo a medical examination, "even if inappropriate under the circumstances, does not constitute an 'adverse employment action' unless accompanied by a material change in the 'terms and conditions' of plaintiff's employment."  *Jackson*, 2006 WL 1751247, at *4; *see also Hoeffner*, 2020 WL 1165851 at *7 .

The Court does not find either party's cases to be applicable here after the Supreme Court's decision in *Muldrow*.  Under *Muldrow*—which imposes a lower burden—the Court finds that Ciotti has adequately pleaded that she was subjected to

---

[7] The parties eventually filed a settlement agreement.  *See* No. 13 Civ. 3306, Doc. 21.

adverse employment actions.  *See Muldrow*, 601 U.S. at 354.  As the Supreme Court made clear, "[t]erms or conditions" in an employment discrimination claim cover more than the "economic or tangible" factors and applies beyond a "narrow contractual sense." *Muldrow*, 601 U.S. at 355.  Like the plaintiff in *Muldrow*, Ciotti experienced a loss that left her "worse off."  Specifically, requiring her to engage in "repeated unwanted, and indeed harassing, counseling sessions – as well as subjecting her to repetitive and utterly unnecessary urine testing . . . left [Ciotti] 'devastated.'"  Doc. 25 at 22 (quoting FAC ¶ 160).  Thus, the Court finds that Ciotti has pleaded sufficient facts that she suffered an adverse employment action.

With respect to the fourth element, Ciotti must plead sufficient facts to provide "at least minimal support for the proposition that the employer was motivated by discriminatory intent" based on her sex as required by Title VII, *Buon*, 65 F.4th at 79 (citation omitted), and that her disability was a but-for cause of an adverse employment action taken against her as required by the ADA, *Natofsky*, 921 F.3d at 348.  *See also Mitchell*, 2024 WL 3849192, at *10.

Ciotti asserts that the 2023 adverse employment actions directly implicate her sex because the unwarranted treatment she received was a direct result of her reporting postpartum depression—a condition that only affects women.  *Id.* at 24.  Further, Ciotti asserts that these adverse employment actions are directly connected to her disability, since all her 2023 allegations occurred after she requested assistance with her postpartum depression.  *Id.* at 23–24.

The City argues that Ciotti's allegations do not demonstrate adverse action on the basis of her gender since "[t]here is no mention of her gender in these allegations nor does she state that similarly situated employees outside her protected class were treated differently than her."  Doc. 23 at 20.  Further, the City argues that Ciotti is "mistaken that postpartum depression is a gender specific condition as men can suffer from postpartum [depression]."  Doc. 26 at 8.  Thus, because Ciotti does not allege any other indicia of

gender related animus aside from the fact that she's a woman, her claims fail to connect her gender to any adverse action.  *Id.* (relying on *Bermudez v. City of New York*, 783 F. Supp. 2d 560 (S.D.N.Y. 2011)).  Under the ADA, the City argues that Ciotti fails to allege that it "had an animus towards her because of her postpartum depression or took any adverse act *because of that* depression."  *Id.*

The Court finds that, while Ciotti identifies cognizable adverse employment actions, she does not plead sufficient facts to prove discriminatory intent on the basis of her sex, or but-for causation on the basis of her disability.  Ciotti alleges all of the 2023 allegations occurred after she requested assistance with her postpartum depression. However, she does not sufficiently allege that the City forced her to undergo medical treatment and forced leave *because of* her postpartum depression, and there are also no purportedly adverse actions that she was treated less well than others—which would give rise to evidence of discriminatory intent.  *See* Doc. 23.  Ciotti's "naked assertions of discrimination[,] without any specific allegation of a causal link between the defendants' conduct and the plaintiff's membership in a protected class, are too conclusory to withstand a motion to dismiss."  *Mitchell*, 2024 WL 3849192, at *10 (alteration in original) (quoting *Williams v. Westchester Medical Center Health Network*, No. 21 Civ. 3746 (KMK), 2024 WL 990153, at *9 (S.D.N.Y. Mar. 7, 2024)).  Thus, Ciotti's discrimination claim under the disparate impact theory is dismissed under Title VII and the ADA.

*ii.   Hostile Work Environment*

The analysis of a hostile work environment claim is the same under both Title VII and the ADA.  *Harris v. New York City Human Resources Administration*, No. 20 Civ. 2011 (JDC), 2022 WL 3100663, at *12 n.16 (S.D.N.Y. Aug. 4, 2022); *see also Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 74 (2d Cir. 2019) ("By borrowing Title VII's language [authorizing hostile work environment claims], Congress suggested that it

intended for the ADA to be coextensive, at least in this respect, with Title VII."). Thus, the Court will examine these two claims together.

The Court considers events before January 26, 2023, because "[s]o long as 'an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Banks*, 81 F.4th at 260 (citation omitted).[8]

"To establish a hostile work environment . . . a plaintiff must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Littlejohn*, 795 F.3d at 320–21 (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)). "Although the victim must subjectively perceive the conduct as abusive, the misconduct shown also must be severe or pervasive enough to create an objectively hostile or abusive work environment." *Fox*, 918 F.3d at 74 (quotation marks and citation omitted). Sometimes, "an isolated act may be so serious that it requires the conclusion that the terms and conditions of employment were altered." *Id.*; *see also Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002). Usually, however, "[t]he incidents complained of must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Littlejohn*, 795 F.3d at 321.

The court must consider "all the circumstances," such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000) (citing *Harris*, 510 U.S. at 23). While other claims focus on discrete harms, a hostile

---

[8] Given the Court's determination that the continuing violation doctrine applies only to Ciotti's hostile work environment claims, the Court will not consider any pre-January 26, 2023 conduct by the City for the other Title VII and ADA claims.

work environment claim requires analysis of the "workplace environment as a whole." *Raniola v. Bratton*, 243 F.3d 610, 617 (2d Cir. 2001).

Moreover, "the plaintiff must show that a specific basis exists for imputing the objectionable conduct to the employer," for example, by showing that the harassing conduct was by supervisory coworkers or, in the case of non-supervisory coworkers, by "showing that the employer knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action." *Fairbrother v. Morrison*, 412 F.3d 39, 48–49 (2d Cir. 2005), *abrogated on other grounds by Burlington Northern*, 548 U.S. Where the harassment was done by a co-employee without supervisory authority over the plaintiff, liability will be imputed to the employer "only if it is negligent, that is, if it either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Richardson v. New York State Department of Correctional Service*, 180 F.3d 426, 441 (2d Cir. 1999) (internal quotation marks omitted), *abrogated on other grounds by Burlington Northern*, 548 U.S.

Ciotti alleges that the FAC is replete with adverse actions that support her hostile work environment claim. Doc. 25 at 21. For example, she alleges that the NYPD ignored her complaints of harassment, actively dissuaded her from filing more complaints with subtle threats, and, when she did complain, used various means, including the counseling services, to cow her or subject her to intolerable treatment. *Id.* at 10 (citing FAC ¶¶ 83–85, 91, 116, 122, 127, 130–35, 138–39, 151–55, 158–60, 163–64, 166).

The City asserts that all of their arguments relating to Ciotti's Title VII and ADA adverse employment action claims also apply to her hostile work environment claim. Doc. 26 at 6 n.3. However, they do not address Ciotti's pre-January 26, 2023 claims, which the Court may consider in its analysis of the hostile work environment claim. *See* Docs. 23 and 26.

The Court finds that Ciotti has sufficiently alleged a work environment permeated with discriminatory harassment or intimidation that was sufficiently severe or pervasive

to alter the conditions of her working environment. Ciotti was repeatedly sexually assaulted and raped, was subjected to undesirable shift changes that affected her ability to care for her child, and, when she complained about the harassment: was transferred to unfavorable assignments that were generally thought of as "discipline" amongst her peers, was ignored by Dr. Lamstein when she sought help, was subjected to offensive comments by supervisors, was dissuaded and shut down whenever she was brave enough to seek help, and overall was subjected to behavior that unreasonably interfered with her work performance. FAC ¶¶ 82, 86, 127, 152, 155, 156; *see also Howley*, 217 F.3d at 154. Further, Ciotti sufficiently alleges that she specifically told numerous supervisors and other employees about the harassment who did nothing about it. FAC ¶¶ 38, 60, 63–65, 71–73, 81–82, 90, 96, 119, 122, 124, 127, 136. The Court finds that, considering the totality of the circumstances, Ciotti has sufficiently alleged a hostile work environment claim at this juncture.

Thus, while the Court does not find that Ciotti has sufficiently asserted a claim of discrimination based on disparate impact, it does find that she has adequately plead discrimination based on a hostile work environment. Therefore, the City's motion to dismiss Ciotti's Title VII and ADA discrimination claims is denied.

### b. Retaliation Claims

Ciotti brings retaliation claims pursuant to Title VII and ADA. FAC ¶¶ 199–203, 211–216; Doc. 25 at 23–25. The *McDonnell Douglas* burden-shifting framework used to analyze claims of discrimination also applies to claims of retaliation under Title VII and the ADA. *Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir. 2003); *see also Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999). However, in the context of a retaliation claim, an "adverse employment action" is broader than it is in the context of a discrimination claim. *Shultz v. Congregation Shearith Israel of City of New York*, 867 F.3d 298, 309 (2d Cir. 2017).

To state a prima facie case for retaliation under these statutes, Ciotti must show that: (1) she participated in an activity protected by Title VII or the ADA, (2) this participation was known to her employer, (3) the employer subjected her to a materially adverse action thereafter, and (4) a causal connection existed between the protected activity and the adverse action. *Moll v. Telesector Resources Group, Inc.*, 94 F.4th 218, 239 (2d Cir. 2024) (Title VII); *accord Tafolla v. Heilig*, 80 F.4th 111, 125 (2d Cir. 2023) (ADA); *Salas v. New York City Dep't of Investigation*, 298 F. Supp. 3d 676, 685 (S.D.N.Y. 2018).

    *i.  Protected Activity*

Ciotti alleges that, even in limiting the claims to 2023, she engaged in two instances of protected activity: (1) requesting accommodations for her postpartum depression, and (2) filing an EEOD complaint against Dr. Sayles in June 2023. Doc. 25 at 21. The City does not dispute that Ciotti's requests for accommodations are protected activity. *See* Doc. 23 at 21. However, the City does dispute that Ciotti's filing of an EEOD complaint against Dr. Sayles constitutes a protected activity, arguing that Ciotti did not complain that Dr. Sayles divulged her medical information *because of her gender*. *Id.*

"A plaintiff seeking to demonstrate that [she] engaged in protected activity need not show that the behavior [she] opposed in fact violated Title VII" or the ADA. *Cooper v. New York State Dep't of Labor*, 819 F.3d 678, 680–81 (2d Cir. 2016) (per curiam); *see also Mitchell*, 2024 WL 3849192, at *14. Rather, a plaintiff must allege that the protected activity "was motivated by a good faith, reasonable belief that the underlying employment practice was unlawful." *Mitchell*, 2024 WL 3849192, at *14; *see also Kelly v. Howard I. Shapiro & Associates Consulting Engineers, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013).

The Court finds that Ciotti's EEOD complaint constituted a protected activity because even "informal complaints to management as to discrimination on a basis

prohibited by Title VII are protected activity," *Amen v. Akzo Novel Chemicals, Inc.*, 282 F. App'x 958, 961 (2d Cir. 2008) (summary order), and the City does not allege that Ciotti lacked a "reasonable belief" that the complained-of conduct violated the law, *Kelly*, 716 F.3d at 14.

      *ii.  Knowledge of the Employer*

The City does not contest whether it had knowledge of Ciotti's request for postpartum depression accommodations. However, in relation to Ciotti's complaint against Dr. Sayles, the City argues that Ciotti does not provide any allegations that Dr. Sayles knew of her complaints when he ordered her treatment. Doc. 26 at 9–10.

In the FAC, Ciotti alleges that Detective Merrill, Ciotti's caseworker at the CSU, told her that Dr. Sayles' order for outpatient therapy, urine testing, and other medical evaluations were "probably" in retaliation for Ciotti's complaint against Dr. Sayles. FAC ¶ 161. Ciotti also states in her opposition that the medical treatment occurred "mere days after Dr. Sayles found out about the complaint." Doc. 25 at 25. The City states that Ciotti's conclusory and incredible allegation that another CSU member had insight into Dr. Sayles' state of mind and stated that she was being retaliated against does not overcome her pleading deficiencies. Doc. 26 at 9–10.

Under the *McDonnel Douglas* burden-shifting framework, the Second Circuit has held that "for purposes of a prima facie case, a plaintiff may rely on 'general corporate knowledge' of her protected activity to establish the knowledge prong." *Kwan v. Andalex Group LLC*, 737 F.3d 834, 844 (2d Cir. 2013); *see also Patane v. Clark*, 508 F.3d 106, 115 (2d Cir. 2007) (finding a "reasonable inference of [a named defendant's] knowledge could be drawn" from the fact that plaintiff complained directly to another employee of the university where that named defendant also worked). Thus, at this juncture, the Court finds that Ciotti has sufficiently pleaded that Dr. Sayles knew about the complaint.

### iii. *Adverse Actions*

With respect to the third requirement, the Supreme Court made clear in *Burlington Northern* that the antiretaliation provision applies to "employer actions that would have been materially adverse to a reasonable employee." 548 U.S. at 57. An action qualifies as "materially adverse" if it is "harmful to the point that [it] could well *dissuade a reasonable worker from making or supporting a charge of discrimination*." *Id.* at 57 (emphasis added). This standard is plainly an objective one, but *Burlington Northern* emphasized that

> [c]ontext matters. The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed . . . . A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children. . . . [And] an act that would be immaterial in some situations is material in others.

*Id.* at 69 (internal quotation marks and citation omitted).

The Court has already found above that Ciotti has sufficiently pleaded adverse employment actions under the new *Muldrow* standard. Thus, the Court rejects the City's argument that Ciotti has failed to sufficiently plead adverse actions for retaliation claims.[9]

### iv. *Causal Connection*

To adequately plead causation under the retaliation provisions of Title VII and the ADA, "the plaintiff must plausibly allege that the retaliation was a but-for cause of the employer's adverse action." *Duplan v. City of New York*, 888 F.3d 612, 625 (2d Cir. 2018) (quotation marks and citation omitted) (Title VII); *Sharikov v. Phillips Medical Systems MR, Inc.*, 103 F.4th 159, 170 (2d Cir. 2024) (ADA). But-for causation "does not require proof that retaliation was the only cause of the employer's action," rather, a

---

[9] As Ciotti points out, it is important to note that "[a]n 'adverse employment action' is read more broadly in the Title VII retaliation context than in the Title VII discrimination context." Doc. 25 at 24 n.7. Thus, since the allegations have met the standard under the discrimination analysis, the Court concludes they meet the standard in the more lenient retaliation context.

plaintiff need only establish that "the adverse action would not have occurred in the absence of the retaliatory motive." *Kwan*, 737 F.3d at 846. "Causation may be shown by direct evidence of retaliatory animus," *Duplan*, 888 F.3d at 625, or indirectly by timing: protected activity followed closely in time by adverse employment action. *See Patane*, 805 F.3d at 116 (explaining a causal connection can be established through temporal proximity alone, where the proximity in time is "very close"); *see, e.g.*, *Vega*, 801 F.3d at 92 (holding that an adverse action taken three months after the plaintiff's EEOC complaint was sufficiently close in time to infer retaliatory motive).

Ciotti claims the 2023 adverse actions were a "direct response" to her request for assistance and accommodations for her postpartum depression, as well as to her June 2023 complaint against Dr. Sayles. Doc. 25 at 24. Ciotti alleges that Dr. Sayles retaliated against her by requiring her to attend therapy sessions and submit to regular urine testing, "approximately one-month post-complaint and mere days after Dr. Sayles found out about the complaint." *Id.* at 25; FAC ¶¶ 158–61. Moreover, she claims the retaliatory nature of the actions was corroborated by a CSU caseworker, who stated: "I don't know why they referred you to the counseling unit. You really shouldn't be here because your case doesn't involve any off-duty incidents or any instances with drugs or alcohol. Look, just play their game." Doc. 25 at 25; FAC ¶ 160. Ciotti argues the temporal proximity and corroborating statements are more than sufficient at this stage of the litigation to establish a causal link between Ciotti's complaints and the adverse actions taken against her. *Id.* (relying on *Natofsky*, 921 F.3d at 353).

The City argues, first, that Ciotti fails to provide any nonconclusory allegations that she was retaliated against for her EEOD complaint or her request for postpartum depression accommodations. Docs. 23 at 22, 26 at 9. It claims that, instead, Ciotti's "own conduct" was the cause of any allegedly adverse employment actions. Doc. 23 at 22. Specifically, the City asserts that CSU's treatment was "related to Ciotti's perceived alcoholism and her conduct during a verbal confrontation with Dr. Sayles," Doc. 26 at 9,

and that any alleged therapy sessions were mandated due to Ciotti's own conduct and were a continuation of her already established therapy program, Doc. 23 at 22. Second, the City argues that the close temporal nexus between Dr. Sayles' conduct and Ciotti's June 2023 complaint does not support an inference of causation, as "the alleged adverse employment action preceded the protected activity." *Id*. (citing *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001)). However, Ciotti alleges that both her request for accommodations for postpartum depression as well as her EEOD complaint preceded the forced counseling, urine testing, and leave. *See* Doc. 25 at 5, 22.

The Court finds that the temporal proximity, along with the corroborating statements, are sufficient at this juncture to establish a causal link between Ciotti's request for accommodations and EEOD complaint and the adverse actions taken against her. *See Patane*, 805 F.3d at 116–17 (finding that temporal proximity, comments that plaintiff overheard of defendants "conspiring" to terminate her employment, and a negative review complaining of plaintiff's "attitude" toward a named defendant were, together, sufficient to establish a causal connection); *see also Banks*, 81 F.4th at 278 ("[W]e have previously held that a period of several months can demonstrate a causal connection between the protected activity and the alleged adverse action."); *see also Zeng v. New York City Housing Authority*, No. 22 Civ. 138, 2023 WL 4553416, at *7 (2d Cir. July 17, 2023) (summary order) (sufficient basis for inferring causation where relevant adverse employment action happened several weeks after plaintiff engaged in protected activity). Based on the foregoing analysis, the Court holds that Plaintiff states claims for retaliation under Title VII and the ADA. The City's motion to dismiss Ciotti's claims of retaliation based on her request for postpartum depression accommodations and June 2023 EEOD complaint against Dr. Sayles is denied.

**B. 42 U.S.C. § 1983 Monell Liability**

*1. Timeliness*

At the outset, the City argues that Ciotti's § 1983 allegations are time-barred by the applicable 3-year statute of limitations period that starts to run once plaintiff "knows or ought to know of a wrong."  Doc. 23 at 9 (quoting *Plumey v. New York*, 389 F. Supp. 2d 491, 497 (S.D.N.Y. 2005)).  They argue that, because Ciotti filed her initial Complaint on November 22, 2023, her *Monell* allegations occurring before November 22, 2020 are time-barred.  *Id*.  However, Ciotti alleges that all of her *Monell* claims are timely under the continuing violation doctrine, because she has alleged multiple timely instances of continuing harassment by the NYPD.  Doc. 25 at 7.

As discussed above, the continuing violation doctrine provides an "exception to the normal knew-or-should-have-known accrual date."  *Lucente v. County of Suffolk*, 980 F.3d 284, 309 (2d Cir. 2020) (quoting *Harris*, 186 F.3d at 248).  Although the doctrine is utilized most often in connection with certain Title VII claims, its application is not limited to that context, and the Second Circuit has applied the continuing violation doctrine to various constitutional claims brought under § 1983.  *See, e.g.*, *Lucente*, 980 F.3d at 309 (applying doctrine to *Monell* claims under § 1983); *Fahs Construction Group, Inc. v. Gray*, 725 F.3d 289, 291–92 (2d Cir. 2013) (applying doctrine to Equal Protection claim); *Shomo v. City of New York*, 579 F.3d 176, 182 (2d Cir. 2009) (applying doctrine to Eighth Amendment deliberate indifference claim).

Where a plaintiff challenges a "continuous practice and policy of discrimination . . . the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it."  *Cornwell v. Robinson*, 23 F.3d 694, 703 (2d Cir. 1994) (internal quotation marks and citation omitted).  To trigger such a delay, the plaintiff "must allege both the existence of an ongoing policy of discrimination and some non-time-barred acts taken in furtherance of that policy."  *Harris*, 186 F.3d at 250.

Ciotti alleges three theories under *Monell*: (1) formal policy, (2) *de facto* policy, and (3) failure to train. FAC ¶¶ 172–93. Ciotti alleges that her *de facto* policy claim is timely because it concerns NYPD's culture, custom, and practice of acquiescing to sexual harassment and retaliating against those who complain about it. Doc. 25 at 8. Ciotti alleges that the violations of her rights arising from this culture, custom, and practice occurred prior to November 2020, starting in 2016 and continuing on through 2023. *Id.*; *see also* FAC ¶¶ 63, 160. Ciotti alleges that the NYPD has subjected her to the following illegal practices well into the statutory period:

- From July through December 2021, she was repeatedly harassed by . . . Angelastro and his friends, FAC ¶¶ 133–35, 138–39, yet, when she tried to complain, the relevant supervisors and police officers dissuaded her from doing so with veiled threats and warnings, *Id.* ¶¶ 136–37, 140;

- In April 2023, her request for assistance related to her postpartum depression through POPPA, ostensibly meant to be confidential, was forwarded to the MSU and used to subject her to retaliation at the hands of Lamstein and other MSU staff members. *Id.* ¶¶ 150–52;

- In April 2023, the NYPD weaponized medical services against her in a deliberate scheme to make her working conditions intolerable. *Id.* ¶¶ 155, 160;

- In April through September 2023, during counseling sessions, Dr. Lamstein berated her again about her sexual assault years prior, including deeming her "mentally unstable" and putting her on involuntary leave, effective immediately, even though it was not relevant to her postpartum depression for which she had sought treatment. *Id.* ¶¶ 155, 160, 166;

- In July 2023, the NYPD subjected her to arbitrary and capricious medical treatment—irrelevant to her postpartum depression—to punish her for complaining about sexual harassment years prior. *Id.* ¶ 160; and

- In August 2023, after she submitted a formal complaint against Sayles, the IAB—in an act of blatant intimidation—came to her home after 10 p.m. without notice to conduct an "interview." *Id.* ¶¶ 163–65.

Ciotti further alleges that her formal policy and failure to train claims are also timely because both claims center around her medical treatment at the hands of MSU staff from 2018–2023. Doc. 25 at 9; *see also* FAC ¶¶ 77–82, 148–66. She claims that, while the initial counseling sessions with MSU staff occurred in 2018, FAC at ¶ 82, "the

2023 counseling sessions expressly reference those earlier sessions and reprise the same cruel treatment [Ciotti] was subject to in 2018." Doc. 25 at 9. Thus, the two sets of violations consist of subjecting Ciotti to the exact same treatment at the hands of the exact same individuals inside the MSU, therefore constituting a set of connected and continuing violations that extends the reach of her claims back to 2018. *Id.*

The City argues that the continuing violation doctrine does not apply to Ciotti's claims because they are not sufficiently related. Doc. 26 at 1 (citing *Birch*, 675 F. App'x at 46). The City makes the same argument as they made in response to the Title VII continuous violation claim discussed above. *Id.* at 1–2. Thus, the City argues that, where Ciotti fails to connect her untimely claims to her timely ones beyond her own conclusory allegations, the continuous violation doctrine cannot be applied. *Id.* at 2; *see also Birch*, 675 F. App'x at 44.

At this juncture, the Court must construe Ciotti's FAC liberally, with dismissal being appropriate only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief." *Harris*, 186 F.3d at 250 (citation omitted). The Second Circuit has stated that, in the statute of limitations context, "dismissal is appropriate only if a complaint clearly shows the claim is out of time. And consistently with the [FAC] it is possible that [Ciotti] could demonstrate some discriminatory act that did occur within the statute of limitations, so that [her] claim would not be time-barred." *Id.* (citing *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir. 1997) (stating that "the mere allegation of the existence of such a [continuing] policy would be sufficient to withstand a challenge for failure to state a claim")). Thus, given Ciotti has alleged "both the existence of an ongoing policy of discrimination and some non-time-barred acts taken in furtherance of that policy," the Court will evaluate acts before November 22, 2020 when analyzing the merits of Ciotti's § 1983 claims. *Harris*, 186 F.3d at 250.

*2. Merits*

Ciotti asserts that the City is liable under § 1983 for the deprivation of her

Fourteenth Amendment rights to equal protection and due process. FAC ¶¶ 172–193.

According to *Monell v. Dep't of Social Services of the City of New York*, a municipality is

liable under § 1983 if it, "under color of some official policy, 'causes' an employee to

violate another's constitutional rights." 436 U.S. 658, 691–92 (1978). "[T]o hold a city

liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is

required to plead and prove three elements: (1) an official policy or custom that (2)

causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City

of New York*, 490 F.3d 189, 195 (2d Cir. 2007) (quotation marks and citation omitted).

> A plaintiff may satisfy the "custom or policy" requirement by alleging:
>
> (1) a formal policy officially endorsed by the municipality; (2) actions taken by
> government officials responsible for establishing the municipal policies that
> caused the particular deprivation in question; (3) a practice so consistent
> and widespread that, although not expressly authorized, constitutes a custom or
> usage of which a supervising policy-maker must have been aware; or (4)
> a failure by policymakers to provide adequate training or supervision to
> subordinates to such an extent that it amounts to deliberate indifference to the
> rights of those who come into contact with the municipal employees.

*McCormick v. County of Westchester*, 19 Civ. 2916 (KMK), 2023 WL 2632204, at *9

(S.D.N.Y. Mar. 24 2023) (internal citation omitted). Under any of these theories, "a

plaintiff must show that the municipal action was taken with the requisite degree of

culpability and must demonstrate a direct causal link between the municipal action and

the deprivation of federal rights." *Board of County Commissioners of Bryan County,

Oklahoma v. Brown*, 520 U.S. 397, 404 (1997). Therefore, the unconstitutional

application of an otherwise valid policy can give rise to municipal liability when: (1) the

municipal employee applying the policy in an unconstitutional manner possesses final

policymaking authority with regard to that policy, or (2) an employee's unconstitutional

application is pursuant to the municipality's directive or derives from the municipality's

failure to adequately train the employee. *See City of Canton, Ohio v. Harris*, 489 U.S.

378, 387–90 (1989); *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 126 (2d Cir. 2004). "The inquiry focuses on whether the actions of the employee in question may be said to represent the conscious choices of the municipality itself." *Amnesty America*, 361 F.3d at 126.

In the context of a motion to dismiss, "a plaintiff must make factual allegations that support a plausible inference that the constitutional violation took place pursuant either to a formal course of action officially promulgated by the municipality's governing authority or the act of a person with policymaking authority for the municipality." *Missel v. County of Monroe*, 351 F. App'x 543, 545 (2d Cir. 2009). Mere allegations of a municipal custom, a practice of tolerating official misconduct, or inadequate training and/or supervision are insufficient to demonstrate the existence of such a custom unless supported by factual details. *Tieman v. City of Newburgh*, No. 13 Civ. 4178 (KMK), 2015 WL 1379652, at *13 (S.D.N.Y. Mar. 26, 2015). In considering whether a plaintiff has pleaded facts in support of her *Monell* claim sufficient to defeat a motion to dismiss, a court may also consider the time span of the actions alleged. *See Lynch v. City of New York*, 952 F.3d 67, 82 (2d Cir. 2020) ("Accepting as true . . . that the City at least in 2004 and seven or eight years thereafter in fact engaged in the False Observation practice . . . the Complaint plausibly allows the inference that notwithstanding the 2007 publicly recorded judicial criticisms of that practice, the City knowingly did not end that practice.").

Ciotti seeks to prove that the City, through its policymakers in the NYPD, violated her Fourteenth Amendment rights to equal protection and due process of law, based on formal policy, *de facto* policy, and failure to train theories. FAC ¶¶ 173–93. The Court will evaluate each of these theories individually.

    *a. Formal Policy*

A formal policy may consist of a "policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the municipalities'] officers." *Monell*,

436 U.S. at 690.  When alleging a formal policy that caused a constitutional deprivation, "it requires only one application of a policy such as this to satisfy fully *Monell's* requirement that a municipal corporation be held liable only for constitutional violations resulting from the municipality's official policy."  *Persaud v. City of New York*, No. 22 Civ. 2919 (AS), 2024 WL 2159852, at *10 (S.D.N.Y. May 14, 2024) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 822 (1985)).  However, "a municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."  *Monell*, 436 U.S. at 692.  To succeed in plausibly alleging a claim for municipal liability against the City, the FAC must demonstrate a "direct causal link" between a municipal action and one of Ciotti's surviving claims of Fourteenth Amendment violations.  *See Arbuckle v. City of New York*, No. 14 Civ. 10248 (ER), 2016 WL 5793741, at *15 (S.D.N.Y. Sept. 30, 2016).

Ciotti alleges that she has sufficiently pled the existence of a written policy pursuant to which "[m]embers of the service are required to cooperate with all counseling as determined by the Department's [CSU]."  Doc. 25 at 18 (citing FAC ¶ 15 (citing the Disciplinary Guidelines)).  Ciotti claims that the CSU formal policy, as applied to her, was used repeatedly to violate her substantive and procedural due process rights, by subjecting her to unnecessary medical treatment in retaliation for her protected complaints—stemming all the way back to 2018 when she first reported sexual harassment.  Doc. 25 at 18 (quoting FAC ¶¶ 155–66, 173–77).  Further, Ciotti alleges that in 2023, when she sought help for postpartum depression, she was subject to unnecessary and unrelated medical treatment and monitoring, including urine testing.  *Id*. at 19 (citing FAC ¶¶ 155–56, 158–60).  Ciotti asserts that, because the official policy provides no recourse for an officer to appeal the mandated medical treatment, she was obliged to comply, suffering a constitutional deprivation, or forfeit her job.  *Id*.

The City argues that Ciotti fails to plead the existence of any municipal policy or custom that violated her constitutional rights since most of her allegations do not relate to

any official NYPD policy and are focused on the individual actions of NYPD service members—which Ciotti does not plead possess any policymaking capabilities.  Doc. 23 at 13.  The City states that "those allegations still fail to plead that anyone was acting pursuant to a municipal policy or practice or possessed policymaking capabilities."  Doc. 26 at 3 (citing *Missel*, 351 F. App'x at 545).

In terms of Ciotti's constitutional deprivation, the City alleges that Ciotti was never fired or disciplined for failing to comply with the CSU—let alone without due process—and thus suffered no deprivation of any due process rights. Without conceding the existence of a constitutional deprivation, the City argues that there was no causation because Ciotti also alleges that CSU employees abused their discretion by subjecting her to unnecessary medical treatment, and has thereby acknowledged that those employees "were not following any official City policy."  Doc. 26 at 5.  Thus, the City argues, "the causal chain from the alleged formal policy is broken."  *Id.*

The Court agrees that Ciotti pleads only in a conclusory fashion that the formal policy was applied to her in a manner that violated her constitutional rights.  Ciotti also does not allege that any of the CSU individuals have the authority to formulate municipal policy.  *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 481–82 (1986).  Accordingly, the Court finds Ciotti has failed to plead a formal policy sufficient to establish *Monell* liability.

   *b.*   De Facto *Policy or Custom*

Under the *de facto* policy theory, "an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law."  *Tieman*, 2015 WL 1379652, at *16 (quoting *Bryan County*, 520 U.S. at 404).  In order to establish *Monell* liability under this theory, Ciotti must show that a "policymaker was aware of a subordinate's unconstitutional actions, and

consciously chose to ignore them, effectively ratifying the actions." *Amnesty America*, 361 F.3d at 126.

Ciotti alleges that the NYPD has the following customs and practices that "discriminate against female police officers based on their gender":

> (a) NYPD has a pervasive and long-standing custom and practice of transferring and/or demoting female police officers in retaliation for making complaints of sexual harassment;
>
> (b) NYPD has a custom and practice in which male officers who sexually harass their female coworkers are not disciplined appropriately and/or in accordance with its own guidelines; and
>
> (c) NYPD has a custom and practice of ignoring female police officers' requests for assistance after self-reporting postpartum and/or [postpartum] depression and similar mental health issues through POPPA, and instead subjecting them to discipline.

FAC ¶ 182.  Additionally, Ciotti alleges there is a *de facto* policy of "the weaponization of medical services, if not to intentionally harm, then be deliberately indifferent to the needs of those like Plaintiff."  Doc. 25 at 2.  In support of her claims, Ciotti references specific instances where she was allegedly "sexually harassed and/or retaliated against, with the knowledge and acquiescence of NYPD supervisors," as well as to similar allegations made by another female officer, Danielle Campo.  *Id.* at 15–17.  In addition, she cites to a news article from *The Village Voice* which reported on instances in which the IAB has "failed to act appropriately to complaints of discrimination."  FAC ¶ 14; Doc. 25 at 16–17.  Ciotti alleges this article helps show that the IAB is "utterly and deliberately indifferent" to unconstitutional customs and practices.  Doc. 25 at 14.

As a preliminary matter, the Court addresses Ciotti's reference to allegations in Officer Danielle Campo's complaint and the news article discussing the IAB.  A plaintiff may establish a *de facto* policy "by citing to complaints [against the same defendant] in other cases that contain similar allegations."  *Gaston v. Ruiz*, No. 17 Civ. 1252 (NGG) (CLP), 2018 WL 3336448, at *6 (E.D.N.Y. July 6, 2018).  However, such complaints must result in an adjudication of liability; unsubstantiated allegations cannot establish a

*de facto* policy. *Isaac v. City of New York*, No. 16 Civ. 4729 (KAM), 2018 WL 5020173, at *17 (E.D.N.Y. Aug. 6, 2018). Because Officer Campo's *Monell* claim was dismissed by the district court, liability was never established, and thus her allegations therein cannot be used to establish a *de facto* policy here. *See Campo v. City of New York*, No. 19 Civ. 4364 (NGG) (SJB), 2022 WL 970730, at *15 (E.D.N.Y. Mar. 31, 2022).

Additionally, courts in this Circuit have rejected the use of news articles and reports to establish a *de facto* policy, where those public sources are not of a "relatively recent vintage" or not "sufficiently connected to the specific facts of the case," as here. *Isaac*, 2018 WL 5020173, at *17. Thus, the Court does not consider any reference to Officer Campo's complaint or the news articles cited in the footnotes of the complaint in its subsequent analysis.

As for Ciotti's argument that her complaint "is replete with instances where [she] was sexually harassed and/or retaliated against," Doc. 25 at 15, the City argues that her claim that these show a *de facto* policy or custom is conclusory because she fails to provide any specific examples, or even identify any officers, that establish any custom. Doc. 23 at 15. The City further argues that Ciotti provides factual allegations only "concerning her *personal* interactions with CSU members," and she "provides no additional examples of officers who suffered similar alleged deprivations at the hands of CSU/POPPA." *Id.* at 14.

The Court agrees that Ciotti's allegations of her own experience are insufficient by themselves to establish a *de facto* policy. *See e.g.*, *Jallow v. City of New York*, No. 21 Civ. 1267, 2021 WL 5121130 (2d Cir. 2021) (summary order) ("[T]hat individual NYPD officers discriminated against him and violated his rights . . . does not suffice to plausibly allege the existence of a sanctioned City policy or custom that caused [plaintiff's] alleged injuries."); *See, e.g.*, *Schnauder v. Gibens*, 679 F. App'x 8, 10 (2d Cir. 2017) (holding no *de facto* policy was alleged where "apart from a detailed recounting of his own experiences, [the plaintiff's] complaint contain[ed] only general and conclusory

allegation[s] that there was . . . a policy" (internal quotation marks and citation omitted)); *Kirton v. Doe*, No. 20 Civ. 10860 (KMK), 2023 WL 2586279, at *9 (S.D.N.Y. Mar. 21, 2023) (dismissing *Monell* claim because "plaintiff does not point to any instance of excessive force beyond his own" to establish a "widespread practice"); *Smith v. Westchester County*, No. 19 Civ. 1283 (KMK), 2019 WL 5816120, at *5 (S.D.N.Y. Nov. 7, 2019) (dismissing *Monell* claim where plaintiff "describe[d] only his own experiences," in alleging a widespread practice, without providing factual details as to other alleged lawsuits and grievances).

Moreover, *Monell* liability rests upon the notion that "isolated acts . . . by non-policymaking municipal employees are generally not sufficient to demonstrate a municipal custom, policy, or usage that would justify municipal liability." *Jones v. Town of East Haven*, 691 F.3d 72, 81 (2d Cir. 2012); *see also Amnesty America*, 361 F.3d at 126 ("[A]n action constitutes the act of the municipality and therefore provides a basis for municipal liability where it is taken by, or is attributable to, one of the city's authorized policymakers."). While Ciotti has alleged that a number of City employees engaged in misconduct, she does not identify a policymaker or supervisor whose "tolerant awareness" of such conduct could "support an inference that they had a policy, custom or usage of acquiescence in such abuse." *Jones*, 691 F.3d at 82; *see also Bird v. County of Westchester*, No. 20 Civ. 10076 (NSR), 2022 WL 2263794, at *12 (S.D.N.Y. June 23, 2022) (dismissing *Monell* claim in part because the complaint only alleged broadly that the municipality "engaged in a policy, custom, or pattern and practice" of unconstitutional conduct in conclusory fashion).

Accordingly, Ciotti's argument that there is a *de facto* policy of discrimination within the NYPD fails because it relies on her experiences alone as evidence of a permanent and long-standing pattern, *see Jones*, 691 F.3d at 81, her factual allegations regarding the deprivation of her constitutional rights are conclusory, *see Bird*, 2022 WL 2263794, at * 12, and she does not identify individuals whose "acquiescence" to the

alleged discrimination permit an inference that there existed a policy of abuse, *Jones*, 691
F.3d at 81.

    *c.  Failure to Train*

    To establish that a municipality's failure to train amounts to deliberate
indifference, a plaintiff must show that the situation is one (1) that a policymaker knew
"to a moral certainty" employees would confront; (2) which presented employees with a
"difficult choice of the sort that training or supervision will make less difficult" or, in the
alternative, that employees have a history of mishandling; and (3) where "the wrong
choice by the city employee will frequently cause the deprivation of a citizen's
constitutional rights." *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992).
Notably, the Supreme Court and Second Circuit consider a § 1983 claim against a
municipality to be "at its weakest" when it is brought pursuant to a failure to train theory.
*Greene v. City of New York*, 742 F. App'x 532, 536 (2d Cir. 2018).

    Deliberate indifference "is a stringent standard of fault, requiring proof that a
municipal actor disregarded a known or obvious consequence of his action." *Connick v.
Thompson*, 563 U.S. 51, 61 (2011) (quoting *Bryan County*, 520 U.S. at 410); *see also
Fleurimond v. Holder*, 403 F. Supp. 3d 95, 115 (E.D.N.Y. 2019) (internal citation
omitted) ("[A] policymaker does not exhibit deliberate indifference by failing to train
employees for rare or unforeseen events."). "The operative inquiry is whether the facts
suggest that the *policymaker's inaction was the result of a 'conscious choice' rather than
mere negligence*." *Newkirk v. County of Suffolk*, No. 17 Civ. 2960 (MKB), 2022 WL
824137, at *8 (emphasis added) (quoting *Amnesty America*, 361 F.3d at 128).

    Ciotti asserts that the NYPD failed to train its employees to address postpartum
depression and sexual abuse to such an extent that it constitutes deliberate indifference.
Doc. 25 at 19–21. Ciotti alleges deliberate indifference by claiming that CSU and
POPPA employees "repeatedly violated her confidentiality, retraumatized her, denigrated
her for coming forward, and disbelieved her claims." *Id.* at 20.

The City argues that Ciotti fails to allege a specific deficiency in the City's training and has only set forth conclusory allegations that the NYPD failed to train. Doc. 26 at 5–6. The City argues that Ciotti simply restates the alleged harm that CSU members allegedly inflicted on her, but does not plead specific deficiencies or that this conduct rose to the level of department wide deliberate indifference to the need for different training regarding postpartum depression. *Id*. at 6. Further, the City states that Ciotti adduces no evidence regarding the allegedly deficient training program, nor does she advance any theory regarding how the City's training is deficient. *Id.*

The Court finds that Ciotti's allegations do not support a plausible inference that the elements of a failure to train theory are met. First, Ciotti alleges that the City "the NYPD [MSU] staff tasked with treating NYPD officers did not simply fail to properly treat [Ciotti] but exhibited deliberate indifference to her sexual abuse and her post-partum depression." Doc. 25 at 20. Ciotti also alleges that "nothing about the way MSU staff attended to Plaintiff's needs shows any understanding of the basic protocols for medical staff to address survivors of sexual assault and those suffering from postpartum depression. Such complete failure of care amounts to a failure to train or properly supervise MSU staff on those subjects." *Id.* at 20–21. Ciotti alleges that as a result of the above described policies and customs, the NYPD willfully disregarded "the obvious need to train its employees in POPPA and CSU regarding postpartum and/or postnatal depression and sexual abuse." FAC ¶ 187.

By themselves, these general allegations are "conclusory, and therefore must be disregarded." *Simms v. City of New York*, No. 10 Civ. 3420 (NGG) (RML), 2011 WL 4543051, at *3 (E.D.N.Y. Sept. 28, 2011) (dismissing conclusory allegations that did not provide "any facts that would allow the court to infer what city policies, practices, or customs contributed to or caused the deficiency"), *aff'd*, 480 F. App'x 627 (2d Cir. 2012); *see also Triano v. Town of Harrison*, 895 F. Supp. 2d 526, 535–37 (S.D.N.Y. 2012) (holding that "mere allegations of a municipal custom or practice of tolerating official

misconduct are insufficient to demonstrate the existence of such a custom unless supported by factual details" and collecting cases); *Bradley v. City of New York*, No. 08 Civ. 1106 (NGG), 2009 WL 1703237, at *3 (E.D.N.Y. June 18, 2009) (alteration in original) (citation omitted) ("The Complaint's conclusory, boilerplate language—that the City 'fail[ed] to adequately train, discipline, and supervise' employees and 'fail[e]d to promulgate and put into effect appropriate rules and regulations applicable to the duties and behavior' of its employees—is insufficient to raise an inference of the existence of a custom or policy, let alone that such a policy caused Plaintiff to be arrested without probable cause.").

Therefore, the Court finds that Ciotti fails to plead sufficient facts to support a *Monell* claim under a failure to train theory. Because Ciotti has not adequately pleaded a *Monell* claim under either a formal policy, a *de facto* policy, or failure to train theory, her § 1983 claims are dismissed.

### C. NYSHRL & NYCHRL Retaliation Claims

Having addressed Ciotti's federal-law claims, the Court turns to her state-law claims. As previously discussed, the City moves to dismiss only the retaliation claims under the NYSHRL and NYCHRL.

Courts apply the same framework for analyzing Title VII, ADA, and NYSHRL retaliation claims. *See Harris*, 2022 WL 3100663, at *15; *Smith v. New York Dep't of Education*, No. 18 CIV. 8545 (PGG), 2019 WL 6307471, at *11 (S.D.N.Y. Nov. 25, 2019). Retaliation claims under the NYCHRL are analyzed more liberally, with the plaintiff required to show only that "she took an action opposing her employer's discrimination, and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Mihalik v. Credit Agricole Cheuvreux North America, Inc.*, 715 F.3d 102, 112 (2d Cir. 2013) (internal citation omitted).

Because Ciotti has plausibly alleged retaliation pursuant to Title VII and the ADA, the Court finds she has also sufficiently pled retaliation under the NYSHRL and the more liberally applied NYCHRL. *See Friederick v. Passfeed, Inc.*, No. 21 Civ. 2066 (RA), 2022 WL 992798, at *11 (S.D.N.Y. Mar. 31, 2022); *Doyle v. American Glory Restaurant Corp.*, No. 23 Civ. 7624 (PAE), 2024 WL 1466161, at *8 (S.D.N.Y. Apr. 4, 2024).

However, whereas allegations prior to 2023 are time-barred for Ciotti's federal retaliation claims, they are not barred for her state-based retaliation claims. The New York State Adult Survivors Act creates a "one-year revival period . . . during which adult survivors of sexual assault c[an] sue their abusers despite the expiration of the previously applicable statutes of limitations." *Carroll v. Trump*, 650 F. Supp. 3d 213, 218 (S.D.N.Y. 2023). Ciotti argues that the Adult Survivors Act revives her otherwise time-barred claims, as "her retaliation claims stem from her complaints to the NYPD of Angelastro's sexual harassment, sexual assaults, and rape – all acts that fall within the ambit of Section 130 of the [New York] Penal Law." Doc. 25 at 13. The City, on reply, states that it "is no longer moving to dismiss Plaintiff's state and local retaliation claims on the basis that they are untimely and the ASA does not revive them." Doc. 26 at 1 n.1.

Thus, the Court will also deny the City's motion to dismiss Ciotti's NYSHRL and NYCHRL retaliation claims.

## IV.    CONCLUSION

For the reasons stated above, the City's motion to dismiss is GRANTED in part and DENIED in part. The discrimination and retaliation claims pursuant to Title VII and the ADA, as well as the retaliation claims pursuant to the NYSHRL and NYCHRL, are not dismissed, but the § 1983 *Monell* claims are dismissed.

The parties are directed to appear for a conference on February 21, 2025, at 10 a.m. in Courtroom 619 of the United States Courthouse, 40 Foley Square, New York, NY 10007.

The Clerk of Court is respectfully directed to terminate the motion, Doc. 22.

It is SO ORDERED.

Dated:    January 27, 2025
          New York, New York

_____
          EDGARDO RAMOS, U.S.D.J.